286 F.2d 4
 PORTLAND WEB PRESSMEN'S UNION, LOCAL NO. 17, an
unincorporated association, Appellant,
v.
OREGONIAN PUBLISHING COMPANY and Journal Publishing Company,
corporations, and each of them, Appellees.
 No. 16892.
 United States Court of Appeals Ninth Circuit.
 Dec. 19, 1960, Rehearing Denied Jan. 27, 1961.
 
 Clifford D. O'Brien, Richard R. Carney, Portland, Or., for appellant.
 Manley B. Strayer, Garry R. Bullard, Hart, Rockwood, Davies, Biggs & Strayer, Portland, Or., for appellee Journal Pub. Co.
 William F. Lubersky, Lewis K. Scott, Koerner, Young, McColloch & Dezendorf, Black, Kendall & Tremaine, Portland, Or., for Oregonian Pub. Co.
 Before HAMLEY, HAMLIN and JERTBERG, Circuit Judges.
 HAMLIN, Circuit Judge.
 
 
 1
 In March of 1958, the appellant, Portland Web Pressmen's Union, Local No. 17, hereinafter called the Pressmen, entered into a collective bargaining agreement with appellees, Oregonian Publishing Company and Journal Publishing Company, hereinafter called the Publishers. By its terms the contract was to run until December 31, 1959, and thereafter from year to year unless written notice of termination was given by either party. On or about September 28, 1959, the Pressmen gave written notice that the agreement would be terminated. Therefore, the contract was to expire and did expire on December 31, 1959.
 
 
 2
 On November 10, 1959, the members of the Stereotypers Local Union No. 48, an association unconnected with the Pressmen, commenced a strike against the Publishers, and established picket lines at the Publishers' plants. Although the Pressmen advised its members not to strike or engage in any work stoppage, each and every member of the Pressmen refused to cross the picket line that had been established by the Stereotypers. Even the Pressmen's officials, who had advised the members not to participate in a work stoppage, refused to cross the picket lines. This situation continued until January 2, 1960, two days after the expiration of the collective bargaining agreement. On that date, the Pressmen officially called a strike against the Publishers.
 
 
 3
 Subsequent to the work stoppage on November 10th no action was taken by either party until December 27, 1959, when the correspondence that ultimately resulted in this suit commenced.
 
 
 4
 On December 27, four days before the contract was to expire, the Pressmen sent a letter to the Publishers requesting that the parties meet in order that a new contract be reached to replace the prior agreement which was to expire.[1] This letter makes no reference to ending the work stoppage, but merely states that the union seeks to negotiate for the purpose of consummating a new contract which would govern the parties for future years. On December 28, 1959, the Publishers relied to the Pressmen's letter as follows:
 
 
 5
 'Gentlemen:
 
 
 6
 'On November 10, 1959, the Stereotypers' Union started a strike against the Oregonian and Journal publishing companies. Your union and its members failed and refused to honor the then existing agreement between the publishing companies and Portland Web Pressmen's Union No. 17. This failure and refusal occurred notwithstanding the fact that under that agreement your union and its members had pledged themselves not to strike.
 
 
 7
 'The refusal by the members of your union to comply with their obligations to the publishers and their refusal to carry out the instructions given them by the publishers to perform their duties have continued without interruption since November 10, 1959. The pressmen who have failed to appear for work over this long extended period are no longer employes.
 
 
 8
 'With respect to meeting for the purpose of negotiating a new contract, we are ready to meet with you at any time you can establish that you represent a majority of our employes in an appropriate unit.'
 
 
 9
 In answer to this letter, the representative of the union sent a night letter to each of the Publishers on December 28:
 
 
 10
 'Gentlemen:
 
 
 11
 'This acknowledges on behalf of Portland Web Pressmen's Local 17 receipt late today of your letter of December 28, 1959, in which you take the position that pressroom employees governed, along with you, by our current agreement which remains in effect through December 31, 1959, are no longer employees of your two newspapers. Local 17 emphatically disagrees.
 
 
 12
 'If you had a grievance in this respect since November 10 you should have resorted to the settlement procedures provided for in our joint and effective agreement.
 
 
 13
 'Local 17 hereby refers the differences between the parties arising out of your said letter of December 28, 1959, to the Joint Standing Committee, and requests a meeting on these emergency issues forthwith. Certainly, there is no occasion for either the publishers or the union to take refuge in the 'within five days' provision to delay such a meeting beyond sometime on the 29th of December, 1959.
 
 
 14
 'Our Standing Committee members stand ready to meet with the publisher members of the same committee upon the shortest telephone notice to the undersigned at or through CH 4-8359.'
 
 
 15
 The Publishers did not respond to this letter. The contract expired on December 31, 1959; the Pressmen called a strike on January 2, 1960; and on January 4, the union representative again wrote and requested that there be a meeting of the joint standing committee in order that the dispute between the parties be settled. On January 11 the Publishers replied and refused to refer the matters to the committee, taking the position that no useful purpose could be served by compliance with the Pressmen's request. On January 15 the Pressmen filed this suit asking that the court compel the Publishers to submit the controversy to arbitration. The Publishers moved that the complaint be dismissed, and on April 14, 1960, the district court granted their motion. It held that the complaint does not present facts showing a justiciable controversy; that the dispute falls within the exclusive jurisdiction of the National Labor Relations Board; and that the breach of the 'no strike agreement' deprives the Pressmen of the right to invoke the arbitration provisions. From that decision the Pressmen bring this appeal. This court has jurisdiction to hear the appeal under 28 U.S.C.A. 1291.
 
 
 16
 Under 301 of the Labor Management Relations Act, 29 U.S.C.A. 185, the federal courts are empowered to compel arbitration under collective bargaining agreements, provided that the movants establish a contractual right to arbitrate. Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. It is therefore necessary to turn to the contract between the parties to see if it creates a legally enforceable duty to arbitrate the dispute presented here. The pertinent provisions of the contract between the Pressmen and the Publishers are contained in the following sections.
 
 
 17
 'Section 4. A joint Standing Committee, composed of two representatives of the parties of the first part and two representatives of the party of the second part shall be appointed, the members representing the parties of the first part shall be selected by the publishers and the members representing the party of the second part shall be selected by the union * * *. To this committee shall be referred all questions which may arise concerning the construction to be placed upon any clause of this contract or alleged violation thereof which can not be settled otherwise * * *. The standing committee shall have jurisdiction to determine whether the disputed issue is covered by the terms of this contract. The joint committee shall meet within five days, when any question of difference shall have been referred to it for decision by the executive officers of either party to this contract * * *.
 
 
 18
 'Section 5. It is agreed that fruitless controversies must be avoided, and every effort made to maintain good feeling and harmonious relations. To accomplish this both parties will in every instance give prompt attention to disputes and will in good faith endeavor to settle all differences by conciliation. Under all circumstances business shall be continued without interference or interruption in a regular and orderly manner, until the dispute is settled by the method set forth in Section 4 of this contract.
 
 
 19
 'Section 20. * * * Neglect of duty, violation of conspicuously posted Company rules or incompetency shall be grounds for discharge which may be appealed under the grievance procedure elsewhere provided in this contract * * *. Discharged employes shall have no right to work as a substitute or regular unless reinstated by the foreman or by the joint standing committee. The Joint Standing Committee shall have authority to determine how, if any, back pay shall be awarded a reinstated employee.
 
 
 20
 'Section 24. During the life of this agreement the party of the second part agrees not to strike and the parties of the first part agree not to lockout the party of the second part. The union reserves the right to refuse to execute any struck work received from or destined to any unfair employing printer or publisher where a strike or lockout exists which has been authorized by the International Printing Pressmen's and Assistants' Union of North America.'
 
 
 21
 We shall first consider the conclusion of the district court that plaintiff's complaint did not present facts showing a justiciable question which could be the basis of declaratory relief.
 
 
 22
 There is no claim that during the life of the contract anything occurred which entitled any of the individual members of Pressmen to compensation. They suffered no grievance during the life of the contract that is compensable in any way. Not a single member was willing to or did report for work from the tenth of November, 1959, until after the filing of this action on January 15, 1960.[2] There is no dispute upon this point, for it is readily admitted by the Pressmen. No arbitrator could award back pay to men who were at all times unwilling to work and who actually did not work.
 
 
 23
 The sole issue that was in dispute between the Pressmen and the Publishers was the technical question of whether the union members who had not worked since November 10th, who had willfully refused to work since that time, who did not intend to work, and who claimed they were not on strike should or should not be technically called employees between December 28 and December 31, 1959.
 
 
 24
 As is stated in Aetna Life Insurance Co. of Hartford, Conn. v. Haworth, 1937, 300 U.S. 227 at page 240, 57 S.Ct. 461, at page 464, 81 L.Ed. 617:
 
 
 25
 'A justiciable controversy is distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. United States v. Alaska S.S. Co., 253 U.S. 113, at (page) 116 (40 S.Ct. 448, 64 L.Ed. 808). * * * It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'
 
 
 26
 Whether the members of Pressmen in this case technically were or were not employees during the brief period in question was of no substantial importance under the contract. It was an 'abstract' and 'hypothetical' question. If an arbitration committee had made a finding either way, no order that it could have made would have altered the rights or remedies of either party under the contract. We agree with the district court that the complaint presented no facts showing a justiciable question which could be the basis of declaratory relief.
 
 
 27
 We likewise agree with the district court that any rights which appellant Pressmen might claim would arise under the National Labor Relations Act and that exclusive jurisdiction would be with the National Labor Relations Board.
 
 
 28
 By the letter of December 27, 1959, the Pressmen state that the only matter with which they are concerned is the right to act as the bargaining agent of the plant workers.[3] The Pressmen raised the question of the status of the employees only after they had received the Publishers' answer. The right that they are seeking to assert is not the right of the individual workers to return to work or to be awarded back pay. They are seeking the right to bargain collectively with the Publishers as exclusive representative of the pressroom employees of the Publishers.
 
 
 29
 In this regard it is interesting to note the union's own statement of the reason that a strike was called on January 2, 1960. Paragraph 15 of the union's complaint in this action reads:
 
 
 30
 'On the 2nd day of January, 1960, plaintiff declared itself and its members on strike against the defendants, and each of them, in protest against the refusal of defendants, and each of them, to bargain collectively with plaintiff as exclusive representative of the pressroom employees of defendants, and each of them, with respect to their wages, hours, and other conditions of work, and also to enforce plaintiff's proposals for a new contract to supplant and supersede the agreement between the parties, which is Exhibit A of this Complaint, and in resistance to the counter-proposals of defendants, and each of them, for a new agreement to supplant and supersede the agreement between the parties, which is Exhibit A to this Complaint.'
 
 
 31
 This statement demonstrates that two days after the expiration of the old contract, the union was not concerned with the rights of the individual members of the union but was rather concerned with the failure of the Publishers to recognize the union as the bargaining representative of the pressroom workers.
 
 
 32
 Whether the Pressmen represented the employees of the Publishers and whether the Pressmen was the proper bargaining agent for the Publishers to deal with in negotiating a new contract, are questions that the N.L.R.B. can properly determine. In fact, the parties could not by private agreement take away from the Board the right to make those determinations.
 
 
 33
 If the Publishers refuse to bargain collectively with the representative of its employees, it is guilty of an unfair labor practice.[4] If the Publishers are guilty of any unfair labor practice, the Board has power to intervene and correct the abuses.[5] 'The N.L.R.B. is empowered to issue complaints whenever 'it is charged' that any person subject to the Act is engaged in any proscribed unfair labor practice.' Local Union No. 25 of International Brotherhood of Teamsters, etc. v. New York, N.H. & H.R.R., 1956, 350 U.S. 155, at page 160, 76 S.Ct. 227, at page 230, 100 L.Ed. 166.
 
 
 34
 In Amazon Cotton Mill Co. v. Textile Workers Union, an action brought by the union to compel the employer to bargain (the members of the union being on strike), the district court issued an interlocutory injunction requiring the employer to bargain with the union. The Court of Appeals reversed, saying:
 
 
 35
 'It is perfectly clear, both from the history of the National Labor Relations Act and from the decisions rendered thereunder, that the purpose of that act was 'to establish a single paramount administrative quasi-judicial authority in connection with the development of federal American law regarding collective bargaining'; that the only rights made enforceable by the act were those determined by the National Labor Relations Board to exist under the facts of each case; and that the federal trial courts were without jurisdiction to redress by injunction or otherwise the unfair labor practices which it defined.'[6]
 
 
 36
 In Textile Workers Union of America, CIO v. Arista Mills Co., 4 Cir., 1951, 193 F.2d 529, 533, the same court of appeals affirmed the doctrine stated in Amazon Cotton, and quoted with approval the following statement made by Chief Judge Jones in Reed v. Fawick Airflex Co., D.C.N.D.Ohio 1949, 86 F.Supp. 822:
 
 
 37
 'It is clear that this Court has no jurisdiction to entertain a petition for relief as to unfair labor practices. Whether acts which constitute unfair labor practices under the statute have been committed by an employer and, if so, what remedies will be prescribed for the employees are matters within the exclusive jurisdiction of the Board. * * * If, however, a particular act is the subject of an agreement between employer and union and the union sues for breach of that contract, the District Court could not be ousted of its jurisdiction to hear and determine the case merely because the act constituted not only a breach of contract but also an unfair labor practice.'
 
 
 38
 The facts of the Reed case clearly involved the meaning of language that had been used in a contract between the employer and the union and involved substantial rights of the parties. In the case presently under consideration, we have pointed out that no substantial rights of the employees under the contract were involved, and no question is raised concerning the interpretation to be placed on the contract between the parties which expired on December 31, 1959.
 
 
 39
 Mr. Justice Frankfurter had occasion to discuss the jurisdiction of the N.L.R.B. in San Diego Building Trades Council, etc. v. Garmon, 1959, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775. He said, at page 244 of 359 U.S., at page 779 of 79 S.Ct.:
 
 
 40
 'When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by 7, of the National Labor Relations Act, or constitute an unfair labor practice under 8, due regard for the federal enactment requires that state jurisdiction must yield.
 
 
 41
 'When an activity is arguably subject to 7 or 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.'
 
 
 42
 We believe that where the question between the parties is whether one or the other has been guilty of an unfair labor practice and there are no substantial contract violations involved (and we have found none here) that the exclusive jurisdiction for the settlement of such a dispute should rest with the N.L.R.B.
 
 
 43
 Nowhere in the record before this court is there any evidence that the individual members of the union have suffered because of the letter written by the Publishers, except to the extent that the Publishers questioned whether the Pressmen represented a majority of their employees. This controversy is specifically covered by the Labor Management Relations Act. 29 U.S.C.A. 158(a) (5). The only right that the individuals have been denied, if in fact there has been a denial, is a right that has been created for them by statute, the right to have their union bargain collectively for them. The statute that grants the right also establishes the procedure that must be used to enforce the right. The place for them to seek relief is through the N.L.R.B.
 
 
 44
 Counsel for the Pressmen rely upon three Supreme Court cases decided June 20, 1960. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1363, 4 L.Ed.2d 1432; United Steelworkers of America v. Warrier & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corporation, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. We do not think that any of these three is in point. In each case the facts showed that the union contended that its members had suffered substantial grievances during the time that the contracts were in effect. In each, if the arbitrator had found that the action of the employer was wrongful, the individual members of the union who were affected by the wrongful action would have been entitled to some compensation. The rights of these individual members were vested in them during the period covered by the contract. As we have pointed out, such facts are not present in this case. The only complaint that the Pressmen makes is that the Publishers refused to engage in collective bargaining with it as the representative of its members. There is no claim made that any of the union members would be entitled to any substantial redress even if the arbitrator decided every issue that was submitted to him in favor of the Pressmen. Settlement of this dispute can only be had by resort to the N.L.R.B. To hold otherwise would be to hold that by a collective bargaining contract the parties are able to take disputes that Congress has consigned to the exclusive jurisdiction of the N.L.R.B. out of the hands of the N.L.R.B. and put them in the hands of a private arbitrator.
 
 
 45
 Counsel for the Publishers contended in the district court and in this court that the violation of the no-strike agreement by the members of the Pressmen deprived the union of the right to invoke the arbitration clause of the contract. In view of our decision and holding as above set out, it is not necessary for us to reach this question, and we expressly decline to pass upon this contention of the Publishers.
 
 
 46
 Judgment affirmed.
 
 
 
 [1]
 'Gentlemen:
 'Portland Web Pressmen's Local No. 17's agreement with your firms will expire on December 31, 1959. The only negotiating session to work out the terms of the new agreement was unproductive of even substantial progress, much less of a settlement.
 'With a view to arranging for more frequent meetings we attempted to reach you by the usual informal telephone method during the past week. These efforts terminated in an inconclusive telephone talk between Mr. Harold Bamberg, representing Local 17, and Mr. S. D. Haines, speaking for both publishers, in which Mr. Haines expressed serious doubts whether a meeting could be arranged, but undertook to advise Mr. Bamberg on this point.
 'This is a more formal demand for a series of meetings to commence immediately and to continue at least through the next several days, looking to the reaching of agreement prior to expiration of our current agreement * * *.
 'Local 17 does not believe that the current existence of labor disputes with other labor organizations impairs or derogates from the obligations of both the publishers and this union to meet and treat in good faith with a view to settlement of our differences * * *.'
 
 
 [2]
 The Pressmen were still on strike when this appeal was argued on November 1, 1960
 
 
 [3]
 See footnote No. 1
 
 
 [4]
 'It shall be an unfair labor practice for an employer * * *
 '(5) to refuse to bargain collectively with the representatives of his employees * * *.' 29 U.S.C.A. 158(a)(5).
 
 
 [5]
 'The Board is empowered as hereinafter provided to prevent any person from engaging in any unfair labor practice * * *. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise * * *.' 29 U.S.C.A. 160(a)
 
 
 [6]
 Amazon Cotton Mill Co. v. Textile Workers Union, 4 Cir., 1948, 167 F.2d 183, at page 186