## Philadelphia Marine Trade Association *v.* International Longshoremen's Association et al., Appellants.

Argued November 9, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Martin J. Vigderman*, with him *Abraham E. Freedman*, and *Freedman, Borowsky and Lorry*, for appellants at Nos. 128, 165, 176, 177 and 178.

*Richard Kirschner*, with him *Richard H. Markowitz*, *Robert M. Rowlands*, and *Wilderman, Markowitz & Kirschner*, for appellants at No. 175.

*Francis A. Scanlan*, with him *William R. Deasey*, *R. Thomas McLaughlin*, and *Kelly, Deasey & Scanlan*, for appellee.

OPINION BY MR. JUSTICE O'BRIEN, July 2, 1973:

These appeals arise from a preliminary injunction and contempt citations entered against an international and several local unions by the Court of Common Pleas of Philadelphia. The injunction and contempt citations were issued against some of the unions (the Longshoremen) for violation of a no-strike clause in a collective bargaining agreement which had allegedly been extended by mutual consent. Other unions (the Seafaring Unions) were cited for contempt because

they allegedly induced the Longshoremen to violate the injunction.

The request for the injunction had originally been filed in the United States District Court, which denied the injunction. Appellee, Philadelphia Marine Trade Association (the Association), then filed suit in the Common Pleas Court of Philadelphia County, which granted the injunction. The Longshoremen, appellants, then sought and were denied the dissolution of the injunction in the United States District Court.

After a series of hearings, the Common Pleas Court of Philadelphia issued contempt citations against appellant unions for their failure to comply with the preliminary injunction issued by the chancellor. These appeals followed.

APPEAL No. 128

Appellants first allege that the Association's failure to secure an injunction in the United States District Court was res judicata. However, in order for either collateral estoppel or res judicata to apply, there must be a question of fact essential to the judgment actually litigated and determined by a valid and final judgment. *Makariw v. Rinard*, 336 F. 2d 333 (3d Cir. 1964).

In the instant case, the United States District Court never made a final determination as to the existence of a union contract, but stated that if a contract did exist, the court would be hesitant to grant the injunction due to the court's concern over the provisions of the Norris-LaGuardia Act.

Appellants next allege that the state court did not have jurisdiction to entertain the request for an injunction. According to appellants, §4 of the Norris-La-Guardia Act[1] and §301 of the Labor-Management Rela-

---

[1] 29 U.S.C. 104.

tions Act[2] pre-empted the field of labor relations and divested the state courts of any power to issue injunctions in labor disputes. However, the chancellor based his decision to issue the injunction on the premise that a valid contract was in existence between appellants and the Association. It is settled law that state courts and federal courts have concurrent jurisdiction to enjoin violations of a collective bargaining agreement. *Boys Markets v. Clerks Union*, 398 U.S. 235 (1970).[3]

Appellants also argue that the state court lacked jurisdiction due to the fact that the Association had a request for an injunction pending in United States District Court. This argument is without merit. In *Princess Lida v. Thompson*, 305 U.S. 456, 466 (1939), the Supreme Court said: ". . . where the judgment sought is strictly in personam, both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them. . . ." See also *Tampa Phosphate R. Co. v. Seaboard Coast Line R. Co.*, 418 F. 2d 387 (5th Cir. 1969), and *Morell Estate*, 426 Pa. 528, 233 A. 2d 522 (1967).

Since the state courts have the power to entertain the request for a preliminary injunction, we must consider appellants' contention that the court below erred in finding that a valid collective bargaining agreement existed between the Association and appellants.

The facts surrounding the dispute are as follows: The collective bargaining agreements between the Association and the Longshoremen's Locals ran from October 1, 1968 to September 30, 1971. On September 20, 1971, Mr. Alfred Cory, Executive Secretary of the

---

[2] 29 U.S.C. 185.

[3] The Unions have not argued that, as a matter of federal labor law, which state courts must also apply, the alleged violations hereof complained are not enjoinable.

Association, wrote a letter to Mr. James Moock, an International Longshoremen's Association International Vice President, offering to extend the existing collective bargaining agreements with the various Longshoremen's unions until the end of the Presidential Wage and Price Freeze, November 12, 1971.

On September 21, 1971, Mr. Moock wrote a letter to Mr. Cory stating that the various ILA Locals in Philadelphia intended to continue working after October 1, 1971, based on extensions of the existing collective bargaining agreements. This letter was apparently written in response to the possible diversion of Philadelphia-bound cargo to Montreal and its purpose was to insure the existence of sufficient work for the unions after September 30, 1971.

Relying on Mr. Moock's letter, Mr. Cory notified the Association members on September 21, 1971, that the contract had been extended, and on September 22, 1971, issued a press release, approved by Mr. Moock, stating that the agreement had been reached to extend the contract until November 12, 1971. The release was disseminated to various newspapers and other publications.

In issuing the injunction, the chancellor relied on the fact that the Local Unions knew of the press release and chose to remain silent, thus luring users of the port to believe that a contract had been reached. The chancellor concluded on the basis of his findings, that as a matter of law, the Local Unions were estopped to deny the existence of the agreement stated in the press release and the press release would be treated as if the locals had signed a contract to extend the original contract between the Association and appellants beyond September 30, 1971.

With that decision, we cannot agree. Mr. Moock had no power to bind the local unions. Neither the press release nor Mr. Moock's letter was ever presented

to the members of the Local Unions for approval. Since contracts between these unions and the Association cannot become valid unless and until the contracts are ratified by the membership, see *Warrior Constructors v. International U. of Op. Eng., Local 926*, 383 F. 2d 700 (5th Cir. 1967), the same type of formality must be present to bind the locals by estoppel. We also note that the release approved by Mr. Moock was issued by the director of the Association. The Association cannot claim it was misled into relying upon a press release which its director had issued. The Association also argues that the users of the port, in reliance on the press release, were lured into thinking that a contract had been reached. However, it is the users of the port who make up the Association. In determining the existence of a contract in the field of labor law, the normal rules of contract law apply. *F. W. Means & Co. v. N.L.R.B.*, 377 F. 2d 683 (7th Cir. 1967). The doctrine of contract by estoppel cannot be used by the party who issued the statement. The doctrine is predicated upon the theory that those persons who become aware of the statement may change their position in reliance upon the truth of the statement. *Puritan Sportswear Corp. v. Shure*, 307 F. Supp. 377 (W.D. Pa. 1969). See also *U. S. Nat. Bk. in Johnstown v. Drabish*, 187 Pa. Superior Ct. 169, 144 A. 2d 640 (1958).

Since we have decided that the appellant unions are not estopped to deny that the contract containing the no-strike clause was not extended, and therefore expired by its own terms on September 30, 1971, the decree in Appeal No. 128 must be reversed. However, even though the preliminary injunction was invalid, that does not determine the legality of the contempt citations. It is well settled that: ". . . an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is

reversed by orderly and proper proceedings." *United States v. Mine Workers*, 330 U.S. 258, 293 (1947).

Consequently, we must now deal with the appeals from each of the contempt citations.

APPEAL NO. 165

This is an appeal from the decree entered on October 25, 1971, holding Locals 1242, 1291 and 1332 in contempt of the above-discussed preliminary injunction which had been issued on October 17, 1971. The contempt decree followed a full hearing at which the employer-Association offered extensive evidence showing that of the 24 longshore gangs ordered for general cargo work and the 24 gangs ordered to discharge sugar, only 4 gangs actually worked (Local 1291) and that of the 451 car loaders ordered to work, only 278 carloaders actually worked (Local 1332). The testimony showed that there were some instances where appellants' members reported to the piers but refused to work or to enter the piers and some instances where the men even refused to report to the piers. There were also some instances where the men commenced working on a pier, but left after visits from fellow members who were not assigned to that particular pier.

The unions do not contest the accuracy of the employer's statistics. Instead, they argue that the record clearly shows that after the October 17th injunction decree, officers of the unions involved called meetings of their local unions, read the court's order to the men, and "made it clear that each and every longshoreman was involved in the order,"* and that, during the ensuing week, union officials continued to urge the men to get on their jobs. Moreover, the unions offered some testimony to show that frequently, men did report to

---

* Opinion of the chancellor.

work, only to learn that the foreman had not received orders from the employers, the members of the Association, to hire the men back.

The Pennsylvania Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, 43 P.S. §206h provides: "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute as herein defined, shall be held responsible or liable in any civil action at law or suit in equity or in any criminal prosecution for the unlawful acts of individual officers, members or agents, except upon proof beyond a reasonable doubt in criminal cases, and by the weight of evidence in other cases, and without the aid of any presumptions of law or fact, both of—(a) the doing of such acts by persons who are officers, members or agents of any such association or organization; and (b) actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof by such association or organization."

While the weight of the evidence in the instant case supports a finding of "(a) the doing of . . . acts [in violation of the injunction] by persons who are . . . members . . . of [Local 1291]" there is no evidence of "(b) actual participation in, or actual authorization of, such acts, or of ratification of any such acts after actual knowledge thereof by [Local 1291]." Consequently, we agree with the appellants that there is insufficient evidence to hold appellants in contempt as a consequence of the walkouts engaged in by appellants' members. See *Wortex Mills v. Textile Workers U. of A.*, 380 Pa. 3, 109 A. 2d 815 (1954); *Mische v. Kaminski*, 127 Pa. Superior Ct. 66, 193 A. 2d 410 (1937).

The Association argues that the appellants were cited for contempt because the court found that the efforts of the various officers were "half hearted and not taken in good faith and inept", and therefore in

violation of the court's specific order that the appellants "take all reasonable steps which may be necessary to insure that this Order is carried out."

However, we believe that much more is required to hold a union or its officers responsible under §206h of the Pennsylvania Labor Anti-Injunction Act. The Pennsylvania provision was patterned after §6 of the Norris-LaGuardia Act, 47 Stat. 71, 29 U.S.C. 106 (1964 ed.). As the United States Supreme Court said in discussing that section in its opinion in the case of *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), quoting its opinion in *Brotherhood of Carpenters v. U. S.*, 330 U.S. 395, 403 (1947) : ". . . whether §6 should be called a rule of evidence or one that changes the substantive law of agency . . . its purpose and effect was to relieve organizations . . . and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."

We believe that §206h of the Pennsylvania Labor Anti-Injunction Act was intended to have the same purpose as §6 of the Norris-LaGuardia Act. Accordingly, since evidence was that rather than "actually participating, giving prior authorization, or ratifying" the work stoppages, the appellants attempted to prevent them, the appellants could not be held responsible for their occurrences.

APPEALS NOS. 175, 176, 177, and 178.

After the conclusion of the hearing on October 25, 1971, the Port of Philadelphia settled down to its usual work routine until November 4, 1971. On that date,

various seafaring unions[4] which worked out of New York and had not been involved in the previous disputes, began a nationwide campaign of publicizing, through picketing and leaflets, the loss of jobs by American seamen to foreign-flagships allegedly employing nationals from other countries at sub-standard wages, hours and working conditions. Employees of the Philadelphia local unions refused to cross the picket lines set up by the outside "seafarers" unions.

On November 8, 1971, a second civil contempt hearing was held with respect to the "seafarers" unions. These unions were held in civil contempt but no fines were imposed on the assurances of the seafarers that the picket lines would be withdrawn. The seafarers appealed at Nos. 177 and 175. The seafaring unions' picket line was immediately withdrawn, but on the following day, November 9, 1971, other picket lines were set up at three major Philadelphia piers by a New York Clerk and Checkers Local of the ILA.

Members of the Philadelphia Longshoremen's Locals refused to cross the picket lines and those members who had already begun working left their jobs. The Association immediately petitioned the court for a rule to show cause why the longshoremen should not be held in contempt for these "work stoppages". The petition and the rule to show cause were served upon officers of the local unions and another hearing was held on the evening of November 9, 1971. At the conclusion of this hearing, the chancellor found as a fact that the officers of the locals were taken by surprise with regard to these pickets and that they had made a good faith effort to correct the situation. Accordingly, he did not hold their officers in contempt and did not

---

[4] The National Maritime Union, the International Organization of Masters, Mates and Pilots, the Seafarers International Union of North America, the Marine Engineers Beneficial Association and the Radio Officers Union.

invoke any of the fines he had imposed in his decree of October 25. However, he found that the members of the longshoremen locals, although they knew the meaning of his original decree and had been specifically advised that it required them to cross the picket lines, nevertheless refused to cross the picket lines. The chancellor then issued a decree providing for conditional fines on both appellants and their members, should they thereafter continue to refuse to cross picket lines. The local unions on behalf of their members appealed at No. 176.

On November 12, 1971, the Association moved for assessment of fines for civil contempt alleging that members of the International Longshoremen's Association Local No. 1271 had continued to engage in work stoppages of November 10 and November 11, in violation of the injunction. After a hearing the chancellor found that, in fact, there had been work stoppages in violation of his previous decree. Since his November 8 decree established a formula by which there would be an assessment of $5,000 for each pier not worked for a whole day, the court used that formula to determine the amounts of the fines even though there was no evidence that the same seafarers unions were doing the picketing on November 10 and November 11 that had been picketing previously. By the formula, the court reached a total figure of $70,000, which was assessed against the union. The union has appealed the fine at No. 178.

We will first discuss the appeals of the seafarers, No. 175 and No. 177.[5] In these appeals, the appellant

[5] The Association has filed a motion to quash the appeal at No. 175, alleging that it was prejudiced when appellants' motion for an extension of time in which to file a printed brief was granted. Since the arguments raised in the appellants' brief for No. 175, with which we have dealt, are identical to those in the appellants' brief in No. 177, we can see no prejudice. Accordingly, we will deny the motion to quash.

unions argue that they cannot be held in contempt of the injunctive decree issued October 17, 1971, since they were not parties to that action and the court specifically found that they were not aiding, abetting or assisting the Longshoremen who were subject to that decree. They also contend that the court's findings unconstitutionally abridge their First Amendment rights and that the matter is within the exclusive jurisdiction of the National Labor Relations Act. Since we agree that the Pennsylvania Labor Anti-Injunction Act is a bar to the court's action, we need not consider the seafarers' other contentions.

The Pennsylvania Labor Anti-Injunction Act, §12 of the Act of 1937 (43 P.S. §2061), which governs the applicability of the October 17th decree, specifically provides that: "No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of findings of fact made and filed by the court in the record of the case prior to the issuance of such restraining order or injunction, and every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case, and as shall be expressly included in said findings of fact made and filed by the court, as provided herein, and *shall be binding only upon the parties to the suit, their agents, servants and employes,* who shall, by personal service or otherwise, have secured actual notice of the same." (Emphasis supplied.)

The appellant seafaring unions were not parties to the original action. Therefore, they were not bound by the October 17th decree and they could not be found in contempt of that decree. The chancellor took the position that the Anti-Injunction Act did not apply because he had not issued an injunction. He further stated that

appellants: ". . . may continue their picketing wherever and in any manner they see fit, so far as this Court's order is concerned, except at such locations as will require any member of the I.L.A. Unions subject to this Court's order to cross respondents' picket line in order to obey the order."

However, whether the chancellor labels his decree as an "injunction" or as something else, the effect is the same. The court is attempting to restrict the appellants from peaceful picketing at a location where their peaceful picketing would be otherwise permitted. Since appellants were not parties to the prior proceedings, the October 17th decree did not restrict their picketing activities and they could not be held in contempt of that decree. See *Alemite Mfg. Corp. v. Staff,* 42 F. 2d 832 (2d Cir. 1930).

APPEAL NO. 176

At the hearing on November 9, the court indicated that it was "entirely satisfied with the good faith of the officers of the union . . . [t]hey were taken by surprise; . . . they did rally and try to cope with the sudden situation that confronted them, and, although as a matter of hindsight perhaps they might have done something more, . . . they did act in good faith."

However, the court specifically found that the men who refused to cross the picket lines were in violation of his October 17th decree. Nevertheless, the court refused to invoke penalties because as the court explained, it was "aware of the tradition that members of one union will not cross a picket line put out by another union."

Since the court did not find the members in contempt on November 9, we need not decide the difficult questions of what safeguards must be followed in order to hold union members in contempt for refusing to

cross another picket line at a time when these members and their unions were subject to an injunction requiring them to honor a no-strike clause of a collective bargaining agreement.[6] The court, apparently realizing the problems which would arise if union members were found to be in contempt by their refusal to cross a picket line, at a time when they had not been apprised that such a refusal could lead to such a finding, decided at the November 9 hearing to issue the following decree:

"I have concluded, after considerable deliberation, that that combination of circumstances offers excuse enough so that at this time I will not penalize the men who refused to cross for contempt. However, I consider that that sort of violation must not be repeated.

"The officers have all promised me that they will be at the waterfront early tomorrow morning with their agents, and that they will make an extensive and concentrated effort to get the men to work should picket lines reappear, including express directions and urgings to have the men cross the picket lines, and I shall expect each of the officers to keep the promise that has been made to me tonight.

"Furthermore, it is one thing to be surprised once; I find no excuse for any future surprises.

"The record makes it plain that tomorrow and each day thereafter until November 13, it is predictable that pickets will show up, whether from New York or from

---

[6] Appellants argue that the refusal to cross another union's picket line is a legally protected activity which can never be held to be in violation of an injunction. The Association cites numerous cases where refusing to cross such a picket line was held to be a violation of an existing no-strike clause. *Labor Board v. Rockaway News Co.*, 345 U.S. 71 (1953); *Portland Web Pressmen's Union v. Oregonian Pub Co.*, 188 F. Supp. 859 (D. Ore. 1960), aff'd 286 F. 2d 4 (9th Cir. 1960), cert. denied. 366 U.S. 912 (1961), *United Steelworkers of America v. CCI Corp.*, 395 F. 2d 529 (10th Cir. 1968), cert. denied, 393 U.S. 1019 (1969).

some other port, and I will not hear in any future proceeding— and I most certainly hope that there is none —a plea by the officers that they were surprised. I shall expect that not only tomorrow morning but every day thereafter adequate measures will be taken by the officers and their agents to insure that, should any pickets appear, there will be a full complement of personnel available to urge the men to cross the line and to obey this Court's order of October 17.

"Furthermore, if tomorrow or thereafter during the duration of this Court's order, despite such conduct by the officers, as the officers have promised me they will do, the men refuse to cross, each man who does so refuse will incur a fine of $50 a day.

"Now, I have recognized the repeated argument by counsel for the unions that that order constitutes a constitutional violation and an imposition of involuntary servitude. I do not see the law that way. There is no imposition of involuntary servitude. I have found and continue to believe that there is a contract that these men are obliged to honor. If any man is sick, if there is a family emergency or some other sufficient reason for not complying with the contract, he will not be held in contempt. If he wishes to resign from the union, he will not be held in contempt. Nobody is compelling anybody to to work. But if a union member, able to work, who reports to work, refuses to work because he doesn't want to cross a picket line, in my view he is in deliberate defiance of this Court's order and he will be found in contempt and will incur a fine of $50 a day.

"Moreover, with respect to every pier where there is no work because of the appearance of picket lines and because men refuse to cross the picket lines, a fine shall be imposed on each union where there are members who refuse to cross, of $5,000 a day per pier, and that fine shall double each day."

Considering the court's duty to insure that its original decree of October 17 be obeyed, and considering that the court did not find the appellants in contempt, we find no error in the court's decree of November 8.

APPEAL NO. 178

On November 12, 1971, the Association was back in Court, making a motion for the assessment of fines for civil contempt alleging that work stoppages had occurred at 12 piers on November 10 and at nine piers on November 11, all in violation of the October 17 injunction. At a hearing, there was testimony that officers of the union had made every effort to insure that the men reported for work. The court believed this testimony and held that the officers of Local 1291 were not in contempt in view of their bona fide efforts. However, because there were in fact work stoppages, the court held Local 1291, itself, in contempt and levied fines totalling $70,000.

We believe that the decree must be reversed. There is even less evidence to support such a finding in this appeal than there was in Appeal No. 165. Here, the court found that the officers had done everything they could to prevent the work stoppages. There was absolutely no evidence that the union or its officers participated in the stoppages, authorized them or ratified them. The case of *United States v. Brotherhood of Railroad Trainmen*, 96 F. Supp. 428 (N.D. Ill. 1951), upon which the chancellor and the Association rely did not involve a statute like our Labor Anti-Injunction Act or the Norris-LaGuardia Act.

Decrees in Appeals No. 128, 165, 175, 177 and 178 reversed. Decree in Appeal No. 176 affirmed. Each party to bear own costs.

Mr. Chief Justice JONES concurs in the result.