568 A.2d 151

FREEPORT TRANSPORT, INC., a corporation, Appellant at No. 8,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, an unincorporated association, and its Local Teamsters, Chauffeurs, Warehousemen, Helpers and Garagemen Union Local No. 538, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Appeal of LOCAL 538, GENERAL TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA at No. 6.

Appeal of INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, an unincorporated association, at No. 7.

Supreme Court of Pennsylvania.

Argued Oct. 24, 1988.

Decided Jan. 3, 1990.

492

Ernest B. Orsatti, Jubelirer, Pass & Intrieri, P.C., Pittsburgh, for appellant at No. 6.

James A. McCall, Intern. Broth. of Team., Washington, D.C., for appellant at No. 7.

Alexander H. Lindsay, Jr., Lawrence P. Lutz, Butler, for appellant at No. 8.

Robert A. Cohen, Ernest B. Orsatti, Louis B. Kushner, Pittsburgh, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

ZAPPALA, Justice.

This matter involves cross-appeals filed by Freeport Transport, Inc. (Freeport), the original plaintiff, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT") and Local 538 of that union, the original defendants, from the Superior Court's per curiam order affirming the judgment for compensatory damages entered in favor of Freeport against both of the defendants and modifying the judgment for punitive damages which was entered only against IBT. 362 Pa.Super. 628, 520 A.2d 67. IBT and Local 538 challenge the propriety of the award of compensatory and punitive damages; Freeport challenges the remittitur of the punitive damages award by the Superior Court.

The underlying action was brought by Freeport, a Pennsylvania corporation engaged in trucking operations, against IBT and Local 538 to recover damages for the destruction of its property sustained during a strike by Local 538 in 1977. Freeport and Local 538 were parties to a collective bargaining agreement that terminated on August 3, 1977. Negotiations for a new agreement proved unsuccessful and on August 4, 1977, Local 538 began to picket at Freeport's place of operations. The strike continued through to November 19, 1977, the date on which an agreement was finally reached. During the strike, there were repeated incidents of violence, which resulted in personal injuries to Freeport employees who had continued to work and extensive damage to Freeport's equipment and property.

After the non-jury trial, the court entered a verdict on December 27, 1984 in favor of Freeport against IBT and Local 538 and awarded compensatory damages in the amount of $33,931.03 plus interest from November 19, 1977. Punitive damages in the sum of $500,000 were awarded to Freeport against IBT only. The verdict was subsequently amended to award compensatory damages totalling $51,-753.82; the punitive damages award was not altered.

On appeal, the Superior Court affirmed the judgment against IBT and Local 538 for compensatory damages. The Superior Court accepted IBT's argument that the punitive damages award was excessive, however, and ordered that the judgment be remitted to $250,000.00. The parties petitioned for allowance of appeal and we granted allocatur to review the matter in light of our recent decision in *Gajkowski v. International Brotherhood of Teamsters*, 519 Pa. 320, 548 A.2d 533 (1988) (Opinion Announcing the Judgment of the Court).

In *Gajkowski*, we addressed the issue of the liability of a union for injuries arising out of violence occurring during strikes under Section 8 of Pennsylvania Labor Anti–Injunction Act, Act of June 2, 1937, P.L. 1198, No. 308, 43 P.S. § 206h. Section 8 of the Act states the nature of the proof

required to establish the liability of a labor organization for the acts of its officers, members, or agents:

No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute as herein defined, shall be held responsible or liable in any civil action at law or suit in equity or in any criminal prosecution for the unlawful acts of individual officers, members or agents, except upon proof beyond a reasonable doubt in criminal cases, and by the weight of evidence in other cases, and without the aid of any presumptions of law or fact, both of—(a) the doing of such acts by persons who are officers, members or agents of any such association or organization; and (b) *actual* participation in, or *actual* authorization of, such acts, or ratification of such act after *actual* knowledge thereof by such association or organization.

43 P.S. § 206h (emphasis added). We noted that Section 8 of the Pennsylvania Act is substantially similar to the language of Section 6 of the Norris–LaGuardia Act, 29 U.S.C. § 106, which has been interpreted by the U.S. Supreme Court to preclude the use of either a standard agency or respondeat superior analysis to hold a union vicariously liable for the torts of its officers, members, and agents. *See, United Brotherhood of Carpenters v. United States,* 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947). In *Philadelphia Marine Trade Association v. International Longshoremen's Association,* 453 Pa. 43, 308 A.2d 98 (1973), we indicated that Section 206h of the Pennsylvania Labor Anti–Injunction Act was intended to have the same purpose as Section 6 of the Norris–LaGuardia Act.

We noted that in *United Brotherhood of Carpenters, supra,* the United States Supreme Court addressed Section 6 of the Norris–LaGuardia Act stating,

... its [Section 6's] purpose and effect was to relieve organizations ... and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officer or member of the organization, *without clear*

> *proof* that the organization or member charged with responsibility for the offense *actually participated, gave prior authorization or ratified such acts after actual knowledge of their perpetration.*

330 U.S. at 403, 67 S.Ct. at 779 (emphasis added). The United States Supreme Court held that "authorization" as used in Section 6 signified a concept different from corporate criminal responsibility for the acts of officers and agents within the scope of their employment, concluding that,

> We are of the opinion that the requirement of "authorization" restricts the responsibility or liability in labor disputes of employer or employee associations, organizations or their members for unlawful acts of the officers or members of those associations or organizations, although such officers or members are acting within the scope of their general authority as such officers or members, to those associations, organizations or other officers or members who actually participate in the unlawful acts, except upon clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized, or necessarily followed from a granted authority, by the association or non-participating member sought to be charged or was subsequently ratified by such association, organization or member after actual knowledge of its occurrence.

330 U.S. at 406–407, 67 S.Ct. at 781 (footnote omitted).

We concluded in *Gajkowski*, and now reiterate, that, as does Section 6 of the Norris–LaGuardia Act, Section 8 of the Pennsylvania Anti–Injunction Act requires a higher showing than the common law rules of agency to establish a union's liability. Imposing a more stringent standard to establish the liability of a union for damages resulting from unlawful acts committed during a strike advances the policy underlying Section 8 of the Pennsylvania Anti–Injunction Act to protect the unions from the potentially crippling effect of lawsuits premised on a showing of fault based on mere agency.

No. 6 W.D. Appeal Docket 1988

No. 7 W.D. Appeal Docket 1988

██ In the instant appeals, both the IBT and Local 538 contend that there was insufficient evidence to establish their liability for the violent and destructive acts which occurred during the strike.[1] To establish the liability of a labor organization for participation under Section 8 of the Anti–Injunction Act, the factfinder must determine (1) that the acts were committed by officers, members, or agents of the organization and (2) the organization actually participated in, authorized, or ratified such 'acts after actual knowledge thereof. A finding of participation must be predicated upon clear proof and may be based upon circumstantial evidence. In determining whether a labor organization has actually participated in the commission of an act, the number of persons involved, the status of those persons in the organization, awareness of the acts, and the organization's ability to exercise control over the acts, are all relevant considerations.

██ Review of the record including the extensive findings of fact made by the trial judge fails to establish the clear proof necessary to support a finding of liability of IBT. The record, however, does support the verdict against Local 538. Therefore, the Superior Court's order affirming the judgment for compensatory damages against IBT and Local 538 must be reversed in part.

During the trial, the names of four individuals involved in the labor organizations surfaced repeatedly as those identified as being present during the incidents of violence. The four men included Raymond Baker, the Secretary/Treasurer and chief executive officer of Local 538, Charles Peart and Gary Griffith, Freeport employees who were members

1. The Superior Court concluded that Local 538 had failed to preserve its issues for appellate review because its motion for post-trial relief did not appear in the official record. It is apparent that the motion for post-trial relief was filed with the trial court and that the trial court considered the issues raised therein. We find that the Superior Court erred in concluding that Local 538 waived the issues raised in its post-trial motion and have considered those issues.

498

of Local 538, and Jack Robison, a member of Local 538 who had been an organizer for IBT's Steel, Freight & Special Commodities Division prior to the Freeport strike. The status of Robison's affiliation with the IBT at the time of the strike was strongly contested by the parties during the trial.

The evidence established that the strike activity commenced immediately after the contract expired on August 3, 1977. Daniel Smetanick, the Vice–President of Freeport, testified that the first person he saw on the picket line at 6:30 a.m. on August 4, 1977 was Jack Robison. On that day, Smetanick attempted to drive a truck to Freeport Brick Company while being followed by members of Local 538 and Robison. The strikers, including Ray Baker, Charles Peart, Gary Griffith, and Jack Robison, would use their vehicles to slow down the truck's movement by veering into the truck's path and by passing the vehicle and then slowing the speed of their cars. The following day, Smetanick was harassed by Gary Griffith who flashed a hand gun from the picket line and threatened to blow Smetanick's head off. Smetanick was then followed while operating his tractor-trailer by Raymond Baker and Peart who attempted to block access to his destination with their vehicle.

Smetanick also testified as to an incident involving members of Local 538, including Raymond Baker and Jack Robison, which occurred in the evening of September 5, 1977. He indicated that approximately two dozen strikers were blocking the entrance to the Freeport terminal. Once it began to get dark, the strikers began throwing rocks and several were shooting projectiles from slingshots. Smetanick recognized Baker, Robison, Peart, and Griffith among the strikers. He did not observe Baker with a slingshot, but did see Robison with one. Baker sighted Smetanick and pointed in his direction, but Baker was too far away for Smetanick to hear what he was saying. The incident ended when the police were called. Windows of the terminal had been smashed and equipment was damaged by the projec-

tiles. As a result of that incident, criminal charges were filed against Robison and Griffith, leading to convictions.

Other drivers for Freeport were threatened and harassed by Robison and Local 538 members. The terminal manager, Raymond Condy, testified that strikers threatened to beat him, that marbles or bearings were fired towards him, and that police intervention was necessary to enable him to leave a loading place. The police escorted him to the boundary limits of the town where the load was picked up. When he arrived at his destination, three of the picketers tried to enter the cab of the truck. He locked the doors and radioed for assistance on his CB. While waiting for the sheriff to arrive, he observed picketers placing objects underneath the wheels of the trailer. When it was safe to do so, he examined the area and found approximately 8 to 10 jack-like objects made of six-penny nails welded together. At his request, he was escorted to the county line by the sheriff, only to be met again by picketers. A projectile was fired from a slingshot which resulted in damage to the vehicle. Several tires were flattened due to spikes.

Condy testified that he saw Robison again at the terminal in late August. He went to assist a driver who had been stopped by pickets and feared for his life because of threats by the strikers that if delivery was attempted, they could not be responsible because he had unsafe equipment which might blow up. When Condy arrived, more than one-half of the 15–20 strikers dispersed. Several, including Robison and Griffith, stayed to harass him. After being threatened that he would be beaten and that they were going to put him in a coffin and bury him, he contacted the police who sent a patrol car that remained while the vehicle was unloaded.

After the police left, he observed Robison with a stick, which was used to poke at him. Condy was gathering hoses and heard something hit the front of the truck. He found that the front windshield had been smashed. After taking a photograph of the damage, he went to the back of the truck, returning to find that Robison's stick was pro-

truding from the radiator. He left the terminal and went back to his pickup truck, discovering that he had four flat tires. The tires had been knifed or ice-picked.

Raymond Condy's other experiences with Jack Robison were even more unfortunate. Robison had threatened to harm Condy and his wife during telephone calls to his residence. One evening while Condy was patrolling a terminal parking lot during the strike, a car drove by on the highway. An exploding device was thrown from the car. A police car driving behind the vehicle gave chase and stopped the vehicle. The driver was Robison. The device that had been thrown was found to be welded spikes tied to an M–80 firecracker. The shrapnel from the device hit cars, but did not harm Condy. After being released from jail, Robison continued to threaten Condy over the phone.

Throughout the strike, Freeport continually sustained damage to its equipment, including the destruction of 140 truck tires, 20 windshields, and the burning of a GMC tractor. Although the perpetrators of each incident could not always be specifically identified, the testimony established that the nature and method of the destruction were repeated. One witness, Roger Alwine, a Freeport mechanic who was a member of Local 538, testified that during the strike, another picketer told him of a device he had created to puncture tires. He was later shown a sample of the device—which was the jack-like device used to destroy tires during the strike. Alwine also testified that after the strike had settled, another Freeport driver who was a Local 538 member admitted having burned the Freeport truck.

In addition to the property damage occurring during the strike and the threats of violence against company officials, their family members, and non-striking employees, two of Freeport's employees were assaulted. One driver, James Morrison, testified that when he attempted to pick up a load on August 29, 1977, picketers pulled a car in front of the entrance to the plant as he entered the driveway. He recognized Peart and Griffith, but at the time did not know the person who was shouting obscenities at him, who then

climbed onto the truck, opened the door, and started to punch him. Morrison learned later that this was Robison. As Morrison grabbed a wrench to hit Robison, Griffith climbed into the truck and pulled the wrench out of his hand. The windshield of the truck was broken, the tires were flattened, and dirt was put into the fuel tank.

Morrison also testified that he encountered Robison a week later when he went into a bar located across from Freeport's New Eagle terminal. Robison offered to buy him a drink, but the bar closed. At another bar, Robison apologized for beating him up, assuring him it was not personal. Robison indicated that it was his job and that he was just doing his job. Subsequently, Robison was charged with simple assault and criminal mischief in connection with the Morrison incident. He pled guilty and was sentenced to a term of imprisonment of one to two years and ordered to make restitution.

Roger Alwine testified that at one of the union meetings held during the strike, the Morrison incident was addressed by Raymond Baker. Alwine indicated that Baker wanted to make the membership aware of the circumstances surrounding the incident. Baker outlined the facts that the driver had been stopped in an attempt to intervene in the delivery and that he had been physically abused. Alwine described the expression on Baker's face at the time as a "grin" and that the membership chuckled in response to his report.

Gerald Bayless, another non-union Freeport driver who worked during the strike, testified that he was injured on October 17, 1977 while traveling to pick up a load of bricks. Bayless was followed by picketers. While driving, he was hit on the head by a projectile which had crashed through the windshield. As a result of the incident, he was hospitalized for a month. He testified that the cheekbone on his right side was Teflon, that his eye sockets were set on Teflon, and that there were perforations in his eyeballs. He was not able to identify who threw the projectile.

Based upon the evidence recited the trial judge found that the IBT and Raymond Baker, as the Secretary/Treasurer and Executive officer of Local 538, instigated, encouraged, and ratified acts of violence by the members of Local 538 and Robison. He also concluded that the evidence established that the destruction of property and incidents of personal violence began at the inception of the strike and continued throughout the length of the strike. The trial court also concluded that Raymond Baker, an officer of Local 538, and other Local 538 members actively participated in the vandalism and violence. Despite the repeated incidents of violence, Local 538 made no attempts to discourage such conduct, but in fact encouraged it. While the actions of the various individuals as cited above were abhorrent, the record fails to disclose any evidence connecting IBT to the individual incidents of violence. With regard to IBT, the *actual* knowledge and assent under section 206h of the Pennsylvania Act is simply lacking. While certainly circumstantial evidence can be used to establish participation and ratification, that circumstantial evidence must establish clear proof of the facts being offered. This record does not provide such clear proof in the case of IBT.

The trial court's findings of fact provide a concise summary of the evidence which was accepted. Reviewing this evidence it is clear that the appellee simply did not establish that IBT actively participated in or ratified the actions of Robison or other individual participants. A recitation of those findings of fact by the trial court is set forth as follows:

45. In the spring of 1973 Jack O. Robison was engaged in an attempt to organize McQuaide Trucking for Teamsters Local 110, at that time there was considerable violence and damage to McQuaide property. (T. 285–291)

46. In 1974 Jack Robison was attempting to organize Martin Trucking Co. for Local 538 and identified himself as representing the International. (T. 256–258)

47. During the aforemention [sic] organizational drive (Findings of Fact No. 46) an employee of Martin Trucking Co. was assaulted by Jack Robison. (T. 259–60)

48. In 1972 the Teamsters with the help of Raymond Baker together with Rolland McMasters, Jack Robison and a Michael Bohanis (Boano) organizers for I.B.T. were attempting to organize Clinton Fuel and Transport. (T. 448–453, 747–8–9)

49. During this period (FF No. 48) the President of Clinton Fuel and Transport was assaulted by Jack Robison and as a result Jack Robison was charged with criminal assault. (T. 451)

50. Eventually the criminal charge against Jack Robison arising from the incident at FF No. 48–49 was dropped in exchange for the Teamsters discontinuing the organizational drive (T. 448–465)

51. Jack Robinson [sic] was a member of Local 538. (T. 809)

52. Acts of strike violence throughout the country by Jack Robison and his affiliation was [sic] I.B.T. is known to the F.B.I. and the Office of the U.S. Attorney. (T. 139–143)

53. No search of I.B.T. files was made by Walter J. Shea, International Vice-President and Assistant to the General President of I.B.T. to determine if Jack Robison was an employee or agent of I.B.T. in 1977 as claimed by Freeport. (T. 674, 715, 728)

54. Rolland McMaster [sic] has been an employee and union organizer for I.B.T. since 1970. (T. 729)

55. In the early 1970's Rolland McMaster [sic] was coordinator and director of the Central Conference of Teamsters engaged in an organizing campaign of steel haulers. (T. 729–743)

56. Rolland McMaster [sic] employed (and trained) Jack Robison as an organizer for I.B.T. through the Teamsters Central Conference until the organizing committee was terminated in 1975. (T. 731–732, 744–5–6–7)

57. Rolland McMaster [sic] at the request of Local 538 participated in a 1977 contract negotiating session with

Freeport's representatives and Raymond Baker at Pittsburgh on November 8, 1977. (T. 734–740, 834)

58. At the meeting on or about November 8, 1977 with Rolland McMaster [sic] and Raymond Baker, Rolland McMaster [sic] told D. Smetanick, of Freeport, that "if we could reach agreement on amnesty for Mr. Robison, there would be no further strike or violence." (T. 42–44)

59. Rolland McMaster [sic] indicated to D. Smetanick that "violence and the strike would continue if we couldn't come to some agreement." (T. 43)

60. Rolland McMaster [sic] indicated that "he wanted to know why the strike continued and that the purpose of his being there was to make a determination whether the International should continue to fund the strike ..." (T. 43)

61. Mr. McMasters had expertise in iron and steel hauling. At the November 8, 1977 meeting he told Freeport that most steel haulers are paid on a percentage method and that he didn't think their contract fit the type of business they were doing. (T. 735, 834)

62. The only evidence of the participation of Mr. McMaster [sic] in the 1977 strike situation was the November 8, 1977 meeting and his earlier association with Jack Robison. (T. 133–6)

63. Theodore Cozza was a general organizer for I.B.T. in 1977. (T. 755–756)

64. In January 1978 Mr. Cozza was a trustee of I.B.T. He was also President of Teamster Local 211. (T. 755)

65. Four meetings were held between representatives of Freeport and Mr. Cozza at the offices of Mr. Cozza in Pittsburgh. These meetings were September 9, 15, 20 and October 20. (T. 758, 763, 765, 766, 35, 884–886)

66. At the first meeting with Mr. Cozza held on September 9, 1977, the discussion included several issues among which was the dropping of charges against Jack Robison and other employees. (T. 36, I.B.T. Exh. 3, 892, 885–892, 900–906)

67. At the second meeting with Mr. Cozza and Mr. Baker on or about September 15 "They seemed to be more concerned about amnesty for Jack Robison than about actual contractual issues". (T. 37)

68. Mr. Cozza had no other concern about other individuals. If Freeport Transport dropped the charges against Mr. Robison, Mr. Cozza could settle and end the strike. (T. 38–39, 900, 903–4)

69. The third and fourth meetings with Mr. Cozza which occurred on September 20 and October 20, were limited to trying to negotiate amnesty for Jack Robison. Nothing of substance was discussed although there were a number of unresolved issues at that time. (T. 39–40, 894–5–6–7) I.B.T. Exh. 2

70. At the third meeting in Mr. Cozza's office, Mr. Cozza informed Local 538 and Freeport that he didn't think that he could be of any further help to them in reaching agreement on a contract. (T. 768)

71. Freeport Vice President Daniel Smetanick stated that Mr. Cozza's efforts did not result in a settlement of the strike. There were several negotiating sessions after the last meeting of October 20, 1977, in Mr. Cozza's office. (T. 119)

72. At a meeting with Mr. Cozza, Attorney Cabot, for Freeport after a private conference with Mr. Cozza, advised the representatives of Freeport that "You know you can settle this thing this evening if you drop the charges." (T. 903–4)

73. The federal mediator who attended the negotiating sessions in the office of Mr. Cozza, told representatives of Freeport a number of times that the strike could be settled if the charges against Mr. Robison were dropped. (T. 900–906)

74. Amnesty for Mr. Robison was the subject at a meeting of Daniel Smetanick and others with Raymond Baker and Tom Fagan at the New Kensington Holiday Inn, Tarentum between September 20 and October 20,

1977.  Other members of the union bargaining unit were not present during those meetings.  (T. 40, 108–113, 383–387)

We find that the trial judge's findings of fact are supported by the record.  However, as a matter of law, these findings do not provide the quantum of evidence necessary to establish actual participation on the part of IBT.  The appearance of a representative of the International in an effort to end a strike does not mean that the IBT approved or encouraged the violence during the strike.  The representative was not speaking for the International when he conveyed the demands of the local to consider amnesty, indeed this was the issue before the participation in the settlement meetings,  For could the International be responsible for failure to settle or for the threat of continued violence, unless the International authorized the representative to speak for them?  The higher standard required under Section 8 to establish liability in this case has not been met by the circumstantial evidence introduced at trial.

Accordingly, the Superior Court's order affirming the judgment for compensatory damage against Local 538 is affirmed and the judgment against IBT is reversed.[2]

STOUT, Former J., did not participate in the decision of this case.

PAPADAKOS, J., files a concurring opinion in which LARSEN, J., joins.

FLAHERTY, J., files a concurring and dissenting opinion.

PAPADAKOS, Justice, concurring.

I agree with the decision reached by the Majority with respect to the International Brotherhood of Teamsters.  I concur in the affirmance of the judgment against Local 538

---

**2.** Having determined that the liability verdict against IBT cannot stand, it is unnecessary to address Freeport's challenge to Superior Court's order remitting the judgment of punitive damages.

only because I believe that there is sufficient evidence in this record to justify the conclusion that Local 538 ratified *de facto* the acts of violence committed herein. The evidence does not support the use of any other theory to justify imposing liability on the Local consistent with my Opinion Announcing the Judgment of the Court in *Gajkowski v. International Brotherhood of Teamsters*, 519 Pa. 320, 548 A.2d 533 (1988).

LARSEN, J., joins this concurring opinion.

FLAHERTY, Justice, concurring and dissenting.

I join with the majority in holding that Local 538 is liable for damages caused to Freeport Transport, Inc., but dissent with respect to the majority's holding that there is no liability on behalf of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (International).

The majority states that a "higher standard" of proof is required to establish a union's liability for the unlawful acts of its personnel than would be applicable under common law rules of agency. Whether the standard of proof would best be characterized as "higher," or merely as "unique," is open to question. Under the Pennsylvania Labor Anti–Injunction Act, proof "by the weight of evidence" is all that is required. 43 P.S. § 206h. This proof must be accomplished, however, "without the aid of any presumptions of law or fact." *Id.* And the proof must establish both of the following elements: "(a) the doing of such acts by persons who are officers, members or agents of any such association or organization; and (b) actual participation in, or actual authorization of, such acts, or ratification of such acts after actual knowledge thereof by such association or organization." *Id.*

Applying this standard to the facts of the present case, the *weight* of the evidence quite sufficiently supports the finding that the International authorized or ratified the

unlawful actions of its union organizer, Jack Robison. The egregious actions of Robison were detailed at length in the majority opinion, and, as the trial court found, the evidence established that Robison was an agent of the International and that his actions were authorized and ratified by the International.

As stated by former Mr. Justice Hutchinson in *Gajkowski v. International Brotherhood of Teamsters*, 515 Pa. 516, 530, 530 A.2d 853 (1987), withdrawn, 519 Pa. 320, 548 A.2d 533 (1988), with regard to holding local unions liable for the unlawful acts of their members:

> Our legislature did not intend Section 8 of the Pennsylvania Labor Anti–Injunction Act to countenance total abdication of union responsibility for deadly violence in tense labor situations. There is a time when those who have accepted responsibility from their fellow workers for advancing the collective good cannot look the other way while irresponsible men openly foment violence which injures people and hauls the labor movement into disrepute.

Union responsibility of course extends beyond the local level to encompass higher-level union management, in this case, the International. The International's strong efforts to negotiate amnesty specifically for Robison were, as they should be, regarded as evidence of ratification of his unlawful acts, sufficient to support a finding of liability for the International pursuant to 43 P.S. § 206h, supra. The International *knew* of Robison's unlawful acts, did nothing to stop them, and then made repeated efforts to negotiate amnesty for him. Indeed, the International expressly represented that strike-related acts of violence would come to an end if amnesty were provided for Robison. Seeking amnesty under these circumstances and in the fashion it did is clear evidence which supports the trial court's finding of ratification on the part of the International.

In all other respects I join the majority opinion.