MacPhail et ux., Appellants, *v.* Pinkerton's
National Detective Agency, Inc.

Argued December 16, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE,
STADTFELD, PARKER and RHODES, JJ.

*Harold B. Bornemann,* with him *Abraham Berkowitz*
and *William A. Gray,* for appellants.

*S. S. Herman,* of *Herman & Harris,* with him *Stanley
Folz,* for appellee.

OPINION BY STADTFELD, J., January 31, 1939:

This is an action in trespass brought by the plaintiffs against the defendant corporation, employer of the person charged with an assault on the wife plaintiff. The jury rendered verdicts in favor of both plaintiffs. The court entered judgment non obstante veredicto in favor of defendant. This appeal followed.

Excepting as to the denial of the alleged assault, there

is no serious dispute as to the facts. Shortly before noon on October 14, 1935, a man, later identified as D'Ambrosio, an employee of the defendant, Pinkerton's National Detective Agency, Inc., called at the plaintiffs' home in the southwestern section of Philadelphia; stated that he represented the Western American Insurance Company; took possession by voluntary surrender of an automobile as to which the plaintiff, James S. MacPhail, was in arrears in payments due the Finance company and drove the automobile off with its California license tags upon it. The car had been purchased in California in the spring of that year.

About 3:30 or 3:45 o'clock that afternoon, D'Ambrosio returned to the plaintiffs' home and spoke to the wife plaintiff, Florence MacPhail, in the absence of her husband. He demanded the "pink slip" accompanying the car, evidently referring to the owner's card. He was informed by Mrs. MacPhail that her husband must have the card but that he was not at home. A discussion followed regarding the liability of the Mac-Phails for damages arising out of any accident in which D'Ambrosio might be involved while using their license tags during which Mrs. MacPhail asked him for his card. This took place on the walk leading from the street to the entrance of the MacPhail home. D'Ambrosio had returned to the plaintiffs' home in the automobile which he had taken earlier in the day. It was parked at the edge of the lawn in front of the plaintiff's house. He entered it, preparatory to leaving, and when Mrs. MacPhail approached him to ask him for his card for the second time, it was alleged that he pushed her in the face, causing her to fall to the sidewalk and sustain the serious injuries for which this action was brought.

At the trial it was established that D'Ambrosio was in defendant's employ and had been directed by his employer to repossess the MacPhail automobile.

As the controversy lies within very narrow limits,

we can best obtain a concrete picture of the situation at the time of the alleged assault by quoting from the testimony of the wife plaintiff. "Q. You were still on the front step? A. Yes. Q. Then what happened? A. Then he walked away. Q. He walked toward the car? A. Yes. Q. Yes. And that was the end of the conversation with regard to the pink slip or license, and the possible liability for driving the car, was it? A. Yes. ...... Q. All this is still on the front step, in the position you have described to us? A. Yes. Then he went over to the car— Q. Then your dialogue, your colloquy, your conversation, whatever you want to call it, was concluded, is that it? A. Yes, I think so. Q. Then he walked over to the car, and did he get in the car? A. He was getting into the car. Q. Yes. Had the door been opened or shut? A. The door was open and the motor was going all the time he was there. Q. All the time? A. Yes. Q. And he walked over toward the car? A. Yes. Q. You had all finished your conversation and he walked over to the car, and did he get into the car? A. He was partly in the car, and I walked over to him. Q. You walked over to him? A. Yes. ...... (By Mr. Herman) Q. I am asking you, whether this push that you say Mr. D'Ambrosio gave you, wasn't quite some period of time after you had concluded all of your conversation and negotiations about getting the license card? A. No. There wasn't much time elapsed. Q. Well, it happened subsequently to the time that he had concluded his conversation with you at the foot of the steps. That is true, isn't it? He started to go back to the car and you remained at the step for an appreciable instant, and then you followed him to the car. Isn't that what you told us? A. Yes, Q. And he had concluded—he had sworn at you, and he had concluded that you didn't have the license card and was leaving your premises is that what was happening? A. Well, that is when I asked him—Q. What? A. Yes. That is when I asked him would he leave his address. Q. That is when you asked him what? A. Wouldn't he

leave his card. Q. Then having concluded this conversation about the license card, he was in the act of getting his car and moving away, when you say for no reason you can assign, he reached out his hand and pushed you. Is that the situation? A. Well, I didn't give him no reason to do it. Q. So, you know of no reason for his doing it at all? A. Other than he was angry, because I didn't have the cards."

D'Ambrosio had called at the plaintiffs' house for the sole purpose of procuring the license card. It is apparent from the foregoing testimony that he had accepted the wife's statement that she didn't have the card, and had walked at least fifteen feet from where the conversation had taken place to his automobile, and had gotten into it before the assault occurred. It was not until then that the wife plaintiff, for a reason of her own, i. e., to try to procure D'Ambrosio's address, followed him to the automobile, when she says the assault occurred. It could, under no circumstances, be considered as having been committed as a means to the procurement of the license card. The entire transaction with regard to the procurement of the license card had been terminated. The alleged assault did not occur during the effort to procure the license card and did not serve as a means to its procurement. The motive which activated D'Ambrosio in committing it and the act itself could not have been in furtherance of his employer's business and must be deemed to have been outside the scope of his employment.

This case falls within the familiar rule that a master is not liable for the wilful misconduct of his servant, and that such wilful misconduct, while it may be within the *course* of the employment, is not within the *scope* thereof.

Appellee relies upon the following authorities which we believe are controlling: *Vadyak v. Lehigh & N. E. R. R. Co.*, 318 Pa. 580, 179 A. 435; *Tshudy v. Hubbs Stores Corp.*, 310 Pa. 285, 165 A. 238; *Guilla v. Camp-*

*bell,* 200 Pa. 119, 49 A. 938; *Cherillo v. Steinberg,* 118 Pa. Superior Ct. 485, 180 A. 115; *Herr v. Simplex Paper Box Corp.,* 330 Pa. 129, 198 A. 309; Restatement of Agency, Vol. 1, secs. 235, p. 529.

In *Vadyak v. Lehigh & N. E. R. R. Co.,* supra, an engineer of the defendant, for some reason which was not explained, discharged steam from the cylinder cocks of his engine upon a boy who, in fright, fell underneath the wheels and had his leg amputated. The court below entered judgment non obstante veredicto, on the ground, as stated in a per curiam opinion of the Supreme Court, that, "...... the act of the engineer was not within the scope of his employment, consequently defendant was entitled to judgment, which was entered in its favor."

The distinction which we have mentioned above is thus drawn in the per curiam opinion of the Supreme Court at p. 581: "There is no suggestion anywhere on the record that it was a necessary part of the engineer's duty at the time to open the engine's cylinder cocks and discharge steam upon the minor plaintiff; the whole implication of the evidence is that he released the steam upon the child in a spirit of mischief, as he had done a short time before in passing two other groups of children, and though this was done in the course of his employment, it was not within the *scope* of his employment. It was not an act the performance of which at that time and place was shown to be in any way in furtherance of the employer's business, but was done by the engineer on his own account, and the trial judge properly found, as a matter of law, that, the act being solely a personal one of the engineer, outside the scope of his duty, the railroad company could not be held responsible for damages: Restatement of Law of Agency, volume 1, sections 235, 238, pages 529, 534; 18 R. C. L. section 256, page 800; *Guilla v. Campbell,* 200 Pa. 119; *Tshudy v. Hubbs Stores Corp.,* 310 Pa. 285"

Quoting from the opinion of Mr. Justice POTTER in

*Guilla v. Campbell,* supra at p. 122: "The act of violence by which the injury was occasioned was not done in execution of the authority given, but was quite beyond it, and must be regarded as the unauthorized act of the servant, for which he himself, and not the defendants, must be answerable. Whether this action was simply careless, or whether it was malicious, it was his own; and was not incident to the authority granted."

In the late case of *Herr v. Simplex Paper Box Corp.,* supra, there is a most exhaustive discussion of the cases, in both American and English jurisdictions, in a very able opinion by Mr. Justice SCHAFFER. Throughout these cases, the distinction between an act done in the course of the employment, but not within the scope of the employment, is carefully emphasized. "If the servant step aside from his master's business, *for however short a time,* to do an act not connected with such business, the relation of master and servant is for the time suspended:" *Morier v. St. Paul M. & M. Ry. Co.,* 31 Minn., 351, 17 N. W. 952, cited with approval by Mr. Justice SCHAFFER. See, also, *Cherillo v. Steinberg,* supra, where, in an exhaustive opinion by President Judge KELLER, the distinction above stated is discussed and applied.

The cases relied upon by appellants are readily distinguishable from the instant case. In *McClung v. Dearborne,* 134 Pa. 396, 405, 408, 19 A. 698, it appeared that defendant's servants ". . . . . . went to McClung's house, secured admission to the parlor by a false pretense, and began the removal of the organ. Mrs. McClung, and her son who happened to be at home, tried to resist, but were at once overpowered, and the organ and its belongings carried off. . . . . . . The acts complained of were committed in the course of, *and as a means to,* the accomplishment of that for which they were sent." (Italics supplied).

So, also, in *McLaughlin v. Singer Sewing Machine Co.,* 75 Pa. Superior Ct. 533, cited by appellants, the

agents of the defendants forcibly removed a sewing machine and in the course of the removal committed a violent assault on the wife plaintiff, who was ill at the time. The court said, at p. 536: "The conduct of Zerbey and Reilley could not be characterized in more fitting term than as a wanton and reckless disregard of the rights of the McLaughlins. As in *McClung v. Dearborne,* 134 Pa. 396, the acts complained of by the plaintiffs were committed in the course of, and as a means to the accomplishment of that for which they were sent, and the orders to retake the machine were complied with in an unjustifiable and outrageous manner: *Traction Co. v. Orbann,* 119 Pa. 37."

If D'Ambrosio assaulted the wife plaintiff, it was purely a personal act and not within the scope of his employment. We think the principle stated was correctly applied and judgment n. o. v. properly entered for defendant.

The judgment is affirmed.