City of Bethlehem *v.* Ronald Gawlik.

City of Bethlehem *v.* Vincent Tiscio. City of Bethlehem, Appellant.

Argued April 7, 1977, before Judges CRUMLISH, JR., MENCER and ROGERS, sitting as a panel of three.

*Robert W. Rudas,* City Solicitor, with him *Robert J. Washko,* Assistant City Solicitor, for appellant.

*George A. Hahalis,* for appellee, Gawlik.

*Jeffrey R. Dimmich,* with him *Wallace C. Worth, Jr.,* for appellee, Tiscio.

OPINION BY JUDGE ROGERS, June 2, 1977:

The City of Bethlehem has appealed from an order of the Court óf Common Pleas of Northampton County ordering reinstatement with back pay of Ronald Gawlik and Vincent Tiscio, patrolmen of the city's police department. The effect of the order of the court below was to overturn a decision of City Council, after hearing, discharging both patrolmen.

The proceedings both before City Council and in the court below were pursuant to Section 4408 of The Third Class City Code, Act of June 23, 1931, P.L. 932, *as amended,* 53 P.S. §39408, which reads pertinently as follows:

> All employes subject to civil service shall be subject to suspension by the director of the department for misconduct, or violation of any law of this Commonwealth, any ordinance of the city, or regulation of the department, pending action by the city council upon the charges made against any of such employes. On hearing before the city council, where they may be represented by counsel, they may be fined or suspended for a period not exceeding thirty days with or without pay, or they may be discharged by city council, if found guilty of the charges made against them. . . .

> Any civil service employe aggrieved by the action of the council in fining, suspending or discharging him shall have the right to appeal by petition to the court of common pleas within thirty days after the suspension or after receipt of written notice of such action by council which it shall be the duty of the council to give and the court shall hear the charges made against

him de novo. The issue before the court shall be whether the action of the council shall be affirmed or be modified in any respect or whether the charges should be dismissed or whether the suspension made by the director shall be affirmed or rescinded. Where any such employe has been suspended and the charges are dismissed or the suspension rescinded on appeal, he shall receive full compensation for the entire period of suspension.

Since it is crucial to our decision in this case, we emphasize at this early place in this opinion that, although the court of common pleas conducts a hearing de novo the court may not substitute its discretion for that of city council if the evidence produced at the hearing in the court below supports the discretion exercised by council; that the court may not interfere with council's decision unless council has flagrantly abused its discretion or violated the law; and that unless the evidence be such that if the case were being tried by a jury the court would be required to enter a nonsuit or a judgment n.o.v. the court is required to affirm the findings of city council even though the court as an independent fact-finding body might conclude otherwise. *Ditko Appeal,* 385 Pa. 435, 123 A.2d 718 (1956), affirming an order of the Berks County Court of Common Pleas on President Judge WARREN K. HESS's opinion reported at 5 D. & C. 2d 569 (1955). A nonsuit can be entered only when it is ''inconceivable, on any reasonable hypothesis, that a mind desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law, after viewing the evidence in the light most advantageous to the plaintiff, could determine in his favor the controlling issues involved.'' *Sargeant v. Ayers,* 358 Pa. 393, 397, 57 A.2d 881, 883 (1948), quoting language from *Virgilio v. Walker and Brehm,* 254

Pa. 241, 98 A. 815 (1916). Judgment n.o.v. may not be grounded on a conflict in testimony or because the reviewing court believes that the weight of the evidence was against the verdict winner or because the reviewing court differs from the fact-finders with respect to the credibility of witnesses. 20 P.L.E. §§145, 146.

Stated slightly differently from the foregoing, disciplinary action imposed by city council may not be disturbed by the reviewing court if council's action was based on substantial evidence. *Ditko Appeal, supra,* 5 D. & C. 2d 569 at 573. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and must be "more than a scintilla" and must "do more than create a suspicion of the existence of the fact to be established." *Pennsylvania State Board of Medical Education and Licensure v. Schireson,* 360 Pa. 129, 133, 61 A.2d 343, 346 (1948).

The trial judge, who apparently entered his order and opinion before the notes of the testimony taken before him were transcribed, decided that there was not substantial evidence supporting city council's action discharging Gawlik and Tiscio, but that there was some evidence of their failure to include certain information in their daily reports. As earlier noted, reinstatement with back pay was ordered, but council was permitted to take "other disciplinary action" on account of the patrolmen's faulty reporting.

It is not necessary to describe in detail the charges filed against Gawlik and Tiscio. They included, in addition to a charge of general misconduct, alleged violation of regulations concerning neglect of duty, incompetence, inattention to duty, and others requiring reports to superiors of activity while on duty. All of the charges grew out of the activities of Gawlik and Tiscio between March 8, 1975 and March 14, 1975,

with respect to Citizen Band radios. In addition to Gawlik and Tiscio, the persons involved are Anthony Mastropieri, an 18 year old high school student employed at a gasoline service station; Louis Salay, the operator of the gasoline service station and Mastropieri's employer; and William J. Kranyecz, also 18 years old and a schoolmate of Mastropieri. We have carefully reviewed the testimony of all of the witnesses who testified in the court below and that of Kranyecz whose testimony before city council, transcribed, was admitted into evidence in the court below and we give a brief review of some of this testimony so that it might be understood why we believe that there is substantial evidence supporting city council's discharge of patrolmen Gawlik and Tiscio and why we are required to reverse the order below.

Gawlik testified that on and after March 1, 1975 he was assigned to patrol car duty in the southwest section of Bethlehem, and that on and after March 8, 1975 Tiscio was his partner. Gawlik was acquainted with Anthony Mastropieri who worked at Salay's service station, a place where he stopped for coffee. On Saturday, March 8, 1975, he talked with Mastropieri at Salay's station. He asked Mastropieri if the latter knew where CB radios might be procured. Gawlik said that his motive was to get leads on stolen radios because a number of thefts of such equipment had been reported in the newspapers. This was his purpose, he said, although it was not a part of his assignment as a patrolman to investigate crimes committed by unknown persons outside of his working shift. Gawlik testified that Mastropieri said that he had a friend who might be able to get CB radios for Gawlik. On the following day, Sunday, March 9, 1975, Gawlik and Tiscio stopped at Salay's station where either Mastropieri or Salay told them that there was a CB radio on the premises. After getting permis-

sion from his sergeant, Gawlik used his own automobile to test the CB radio at the station for Salay who was going to purchase the radio for $25. Although Gawlik then suspected that the radio Salay was about to purchase may have been stolen he made no check with headquarters to see whether a radio of the description of the one at Salay's had been reported stolen,[1] and he made no report to any superior of any of his activities with regard to CB radios at Salay's until Wednesday, March 12, 1975. Gawlik next saw Mastropieri by prearrangement on Monday, March 10, 1975, at about 3:30 o'clock P.M. when he and Tiscio went to Salay's station where Mastropieri told Gawlik that he got the radio which had been sold to Salay the day before from a friend named Bill and that Bill might have some more. Gawlik asked Mastropieri to have Bill get more radios. Pressed, Gawlik agreed that he had testified before city council that Mastropieri then told him that Bill stole CB radios. Gawlik and Tiscio returned to Salay's station at 9:00 o'clock P.M. on March 10, 1975 where they met Mastropieri and William J. Kranyecz. Kranyecz told the officers that he stole CB radios and produced one. This was taken into the service station, where Gawlik, Tiscio, Salay, Mastropieri and Kranyecz conferred.[2] Salay produced $20, Gawlik produced $5, the CB radio itself was delivered to Salay after Gawlik removed and kept the microphone. On Monday, March 10, 1975, Gawlik also asked Mastropieri to tell Kranyecz and a person associated with Kranyecz named Pat to meet Gawlik and Tiscio in a park on the night of Tuesday,

[1] CB radios of course are identifiable by the manufacturers' names and by serial numbers. New, they sell for upwards of $100.

[2] There was testimony that Tiscio suggested going indoors because a vice squad car was parked nearby from which they might be observed if they remained outdoors.

March 11, 1975 and to bring CB radios with them.[3] Gawlik testified that he received a telephone call from Tiscio on Wednesday, March 12, 1975 informing him that Kranyecz had visited Tiscio at Tiscio's home and expressed concern that they were being investigated. As a result of this event, Gawlik and Tiscio went to Salay's, got the two stolen CB radios and turned them over to their superiors. Gawlik admitted that he had the microphone from the second radio and that he had attached it to the CB radio in his personal car, that he did not turn this into headquarters until Friday, March 14, 1975, that no record of any of these activities were reported on his daily log for March 8, 9, 10 and 11, 1975, and finally, that he had at some time during these events delivered to Salay another CB microphone for use on the second CB radio purchased from Kranyecz. Gawlik maintained throughout his testimony that everything which he did was in pursuance of his and Tiscio's investigation of stolen CB radios.

Patrolman Tiscio testified that he went with Gawlik to Salay's service station on March 8, 1975, met Mastropieri but had no conversation with him and that he visited the station with Gawlik on March 9, 1975 when Gawlik tested the first CB radio for Salay. He denied having any conversations with anyone at the station on this occasion. He admitted being at the station at 9:00 o'clock P.M. on March 10, 1975 where, with Gawlik, he met Mastropieri and Kranyecz and witnessed the transaction in which Salay bought the second CB radio and Gawlik got the microphone. Tiscio admitted that he had a conversation with Kranyecz in which Kranyecz admitted having attempted to steal a CB radio from Tiscio's personal car. Tiscio

---

[3] This rendezvous was not kept by Kranyecz because Mastropieri failed to tell him about it.

said that Kranyecz visited his house on Wednesday, March 12, 1975, accompanied by Mastropieri. Tiscio said that Kranyecz expressed concern over being the subject of a possible police investigation. After Kranyecz left he told Gawlik of the visit and reported the events of the several days previous to his superiors.

Mastropieri testified that he had introduced Gawlik to William Kranyecz on Sunday, March 2, 1975, and that he told Gawlik on that occasion that Kranyecz had stolen a tape deck from his, Mastropieri's, automobile. He testified that Gawlik asked him whether he could get Gawlik a CB radio. Mastropieri testified that Kranyecz delivered a CB radio to Mastropieri who took it to Salay's station on Saturday, March 8th. He further testified that on Sunday, March 9, 1975, Gawlik asked him to have his friend Bill get him, Gawlik, a radio. On Monday, March 10, 1975, Mastropieri told Gawlik that he would get him a radio; that he asked Kranyecz to get one and that Kranyecz brought one in Monday evening. Mastropieri described the events in Salay's service station resulting in Salay getting the radio and Gawlik getting the microphone. Mastropieri further testified that on this occasion Tiscio told Kranyecz of an automobile parked at the rear of a Gulf gasoline station which had a certain type of CB radio in it which he would like to have if Kranyecz would get it for him. Mastropieri also testified that on the occasion of the meeting with Kranyecz on the evening of March 10, 1975, Tiscio suggested that the parties meet inside the station because a police vehicle attached to the vice squad was parked near the station.

Louis Salay testified that Gawlik bought the microphone from the second CB radio produced by Mastropieri in cooperation with Kranyecz for $5 and that Gawlik subsequently delivered a different microphone for use on that radio. At the time he, Salay, pur-

chased the second radio the general conversation was that the two radios he had purchased had been stolen. Salay also testified that Gawlik and Tiscio had made no mention of being engaged in investigating stolen radios.

Kranyecz, like Mastropieri, an 18 year old high school student, testified that he met Gawlik on or about March 2, 1975, and that he met Gawlik and Tiscio on the evening of March 10, 1975. He had supplied Salay with a stolen radio on Sunday, March 9, 1975. On Monday evening, March 10, 1975, he took a stolen set to Salay's station where he met Gawlik and Tiscio. He handed the radio to Gawlik and they went into the service station. There Gawlik said that it was a Midland and that he, Gawlik, had one just like it; that Gawlik detached the microphone and said he would use the mike on his radio. Salay got the radio without the microphone. Kranyecz said that Tiscio described a certain automobile and its location, told him he wanted the CB radio in it, that a burglar alarm was installed on the vehicle and described where the wires of the burglar alarm were. Kranyecz further testified that Gawlik said that he and Tiscio would fence any stolen radios Kranyecz could procure and that they would buy them because they could sell them. He also testified that as a result of this offer he and a friend stole five or six CB radios that night and the night and morning of the next day.

Although both Gawlik and Tiscio insisted that they were on an investigation, there is clearly more than sufficient competent evidence in this record to support a determination that patrolmen Gawlik and Tiscio were, to give their activities a most charitable view, guilty of "failure to take appropriate action on the occasion of a crime," failure to communicate "valuable information regarding . . . [a] . . . police

case" and "failure to report promptly"—all requirements of Bethlehem's police regulations.

We repeat that the choice of what conflicting evidence is to be believed, the weight of the evidence, the inferences to be taken, were all matters for city council's decision. Further, the court below agreed that Gawlik and Tiscio were derelict in reporting their activities. Speaking generally of civil service acts, Justice COHEN in *Baker Case*, 409 Pa. 143, 147, 185 A.2d 521, 523 (1962), wrote that "primary responsibility and decision as to the methods necessary to uphold police morale and efficiency and to maintain public confidence in the police department resides in the municipal officials," and that the "function of the courts is merely to make sure that just cause for dismissal exists, both factually and legally. . . ." It was not for the court below and it is not for us to decide what penalty we would have meted out. *See also Bell Appeal,* 396 Pa. 592, 152 A.2d 731 (1959). Since it is clear that substantial evidence supported city council's finding that there was just cause for the dismissal of Gawlik and Tiscio, the court below erred in ordering their reinstatement on any terms.

We therefore enter the following

### ORDER

AND Now, this 2nd day of June, 1977, the order of the court below made January 7, 1976, is reversed and the resolutions of the Council of the City of Bethlehem Nos. 8244 and 8245, respectively, discharging patrolman Ronald Gawlik and patrolman Vincent Tiscio, are reinstated.