504 A.2d 840

Ronald J. and Frances GAJKOWSKI

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and Highway Truck Drivers and Helpers Local Union No. 107, Appellants.

Ronald SCHIPSKE

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and Highway Truck Drivers and Helpers Local Union No. 107, Appellants.

William and Jean ABATE

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and Highway Truck Drivers and Helpers Local Union No. 107, Appellants.

Superior Court of Pennsylvania.

Argued April 3, 1985.

Filed Jan. 28, 1986.

286

288

Thomas W. Jennings, Philadelphia, for appellants.

Gregory T. Magarity, Philadelphia, for appellees.

Before CAVANAUGH, OLSZEWSKI and HOFFMAN, JJ.

CAVANAUGH, Judge:

The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (IBT or union) and Highway Truck Drivers and Helpers Local Union No. 107 (Local 107 or union) appeal from the denial of post-verdict motions which sought a new trial or judgment N.O.V. The motions were filed following a bifurcated liability and damage trial at which the jury first found in favor of all appellees and, thereafter, awarded damages for personal injuries and loss of consortium to the three injured claimants, Francis Gajkowski, Ronald Schipske and William Abate, and the spouses of Abate and Gajkowski.[1] Numerous issues are raised on appeal. Since we decide that there was insufficient evidence to support the verdicts against either appellant, we reverse and enter judgment N.O.V.

---

1. The total damage awards exceeded 1.3 million dollars.

This case arises out of a tragic incident which occurred on January 25, 1980 at the site of the Minnesota Mining and Manufacturing Co. (3M) facility in Bristol Township, Bucks County, Pennsylvania. On that date, in the evening hours, the appellees received bullet wounds from a .22 caliber revolver which was apparently fired by one Robert Ballinger. Ballinger, Gajkowski and Schipske were all employees of 3M and members of Local 107 who were involved in a strike action against 3M. Abate was a security guard in the active employment of 3M and was not a member of Local 107. Suit was brought against the appellant unions on the basis that the shootings were the result of the negligence of the unions in failing to control the picket line. Appellants defended on the grounds, *inter alia*, that the right to recovery was delimited by provisions of the Pennsylvania Labor Anti-Injunction Act, 43 P.S. § 206h; that there is no duty in the unions to control the picket line so as to form the basis for appellees' action in tort; and that the shooting was unforeseeable and beyond the ambit of the unions' responsibility. In order to grasp the thrust of appellees' claim at trial it is first necessary to review the evidence and to examine the competing arguments which arose.

Local 107 is a union which represents some 400 to 500 employees of 3M in twelve departments at 3M's Bristol, Pennsylvania plant. Local 107 and its parent affiliate IBT are both unincorporated associations. On November 18, 1979 the members of Local 107 at 3M voted to reject a "final" company offer and to commence a lawful economic strike on the next day. This was just short of ten weeks before the shooting episode. The union commenced picketing the next day, and continued doing so on a daily basis around the clock. It is clear from the evidence that during the course of this extended strike, the picket line operation was essentially incident free. Numerous witnesses attested to the fact that the picketing was "peaceful" and even "friendly" in its operation. During this period, 3M did not seek any injunctive relief to limit the number, location or

manner of picketing. There was, however, evidence that picketers had engaged in drinking alcoholic beverages while on picket duty and that this was against union policy and instructions. Nevertheless, there was no evidence that the drinking led to any serious incidents, at least until the night of the shooting.

On January 25, 1980, Officer Stephen Whiteman of the Bristol Township Police Department was on duty and as was his practice, he routinely checked the picket site. There had been some reports of bottle throwing and other misconduct during the evening but when he checked the scene at 8:30 P.M. he found no problems to be present. It was, however, only minutes later that he was called back and discovered that Schipske and Gajkowski had been shot. He found them lying in a driveway. Abate had also been shot and was found on the floor in a guardhouse. While emergency aid was being given to the victims, Whiteman began questioning the strikers and had the strike captain, William Miesznek call the workers over to him in pairs. The workers, for the most part, gave their names only and did not describe what had happened. Finally, Whiteman went to the group of strikers when individuals had ceased voluntarily appearing and said that they should come to be interviewed or face being taken to the station house. When he got to Robert Ballinger, Ballinger said "I did it" and "I'll go for it." At that time, he reported this to James Swope, who was the detective on the scene. Swope testified that when he interviewed Ballinger, Ballinger told him that he was trying to shoot out the lights at the guardhouse and apparently hit the three individuals.

Earlier in the day, strikers Ballinger, William Crossan and Robert Kendig had been together for an extended luncheon period at a tavern where they had been drinking beer. It was their intention to return to the 3M plant to distribute leaflets. The mood of the strikers was apparently heightened by the fact that a few days later there was to be a motorcade demonstration in Philadelphia to support the strikers' cause. Later, Kendig had stopped at his residence

and when he returned to the scene he had with him a .22 caliber revolver. William Crossan was aware that Kendig had the firearm in his possession. After returning to the scene, leaflets were distributed, activities escalated, and beer drinking among many of the strikers continued. A number of union members threw bottles at the guardhouse during the time before the shooting, but soon this activity subsided. It is clear that Kendig displayed his revolver and at some stage he was attempting to shoot parking lot lights out and, in particular, was seeking to strike a light and camera above the guardhouse. During the bottle throwing, a hurled bottle struck a flag and came down on the head of Ballinger who received a cut on the head, but sought no medical attention. At one time Crossan told Kendig to put the gun away "in no uncertain terms."

There was evidence that the weapon was handed from Kendig to Ballinger and while Ballinger was in possession of it the triple shooting occurred (Ballinger, called in the plaintiff's case, however, stated that he did not do the shooting.)

The theory upon which appellees ground their claim is that the unions negligently maintained the picket line; that they encouraged, condoned, acquiesced and participated through their agents in the violent behavior of the striking employees which led to the shooting. In furtherance of their theory, much of the extensive testimony elicited by plaintiffs at the liability phase of the bifurcated trial related to the relationship between the unions and various members. The trial court denied the unions' motions for a non-suit and a directed verdict and submitted the case to the jury.

## THE APPLICABILITY OF THE PENNSYLVANIA LABOR ANTI–INJUNCTION ACT

■ We first address the unions' defense that the sole applicable standard of proof to be applied in determining a labor organization's liability for violence occurring during

the course of a labor dispute is that which is set forth in § 8 of the Pennsylvania Labor Anti-Injunction Act.

### § 206h. Liability of officers and members of labor organizations

No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute as herein defined, shall be held responsible or liable in any civil action at law or suit in equity or in any criminal prosecution for the unlawful acts of individual officers, members or agents, except upon proof beyond a reasonable doubt in criminal cases, and by the weight of evidence in other cases, and without the aid of any presumptions of law or fact, both of—(a) the doing of such acts by persons who are officers, members or agents of any such association or organization; and (b) actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof by such association or organization. 1937, June 2, P.L. 1198, § 8.

Act of June 2, 1937, P.L. 1198 § 8, 43 P.S. § 206h.

Thus, the argument is that the above Act shields the unions from the plaintiffs' claim unless it can be shown that the offending acts were done by officers, members or agents of the union and that there was "actual participation in or actual authorization of" or "ratification of" the acts by the union. Our Supreme Court has recognized that the Pennsylvania Labor Anti-Injunction Act was patterned after § 6 of the Norris-LaGuardia Act, 47 Stat. 71, 29 U.S.C. § 106, and adopted the language of the United States Supreme Court in describing the purposes of § 206h.

"... whether § 6 should be called a rule of evidence or one that changes the substantive law of agency ... its purpose and effect was to relieve organizations ... and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actu-

ally participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."

*Philadelphia M.T. Ass'n v. International Long. Ass'n.*, 453 Pa. 43, 52, 308 A.2d 98, 103 (1973), quoting from *Brotherhood of Carpenters v. United States*, 330 U.S. 395, 403, 67 S.Ct. 775, 780, 91 L.Ed. 973, 982–83 (1947). The United States Supreme Court later, in discussing § 6, stated:

> ... the simple concern of Congress was that unions had been found liable for violence and other illegal acts occurring in labor disputes which they had never authorized or ratified and for which they should not be held responsible. Congress discerned a tendency in courts to blame unions for everything occurring during a strike.

*Ramsey v. United Mine Workers*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971). The legislative history is in accord. S.Rep. No. 163, 72 No. Cong. 1st Sess. 19 (1932).

> To hold that an officer or member of a labor organization, or the organization itself, should be liable for damages for unlawful acts committed while a strike is on, without clear, actual proof of authorization, participation in, or ratification of such unlawful acts, would go far towards the destruction of organized labor.

The § 6 standard has been held to reach or extend to an action in tort to recover damages. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and has been applied to tort action based on state law in *C & K Coal Co. v. United Mine Workers*, 704 F.2d 690 (3rd Cir.1983). *See also C & K Coal Co. v. United Mine Workers*, 537 F.Supp. 480 (W.D.Pa.1982) [same case]. *Curreri v. Teamsters Local 251*, 722 F.2d 6 (1st Cir.1983); *Kerry Coal Company v. United Mine Workers*, 637 F.2d 957 (3rd Cir.1981); *Ritchie v. United Mine Workers*, 410 F.2d 827 (6th Cir.1969); *Federal Prescription Service, Inc. v. Amalgamated Meatcutters and Butcher Workmen*, 527 F.2d 269 (8th Cir.1975); *Kayser-Roth Corp. v. Textile Workers Union*, 479 F.2d 524 (6th Cir.1973), *cert. denied*, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). *See also Philadelphia Marine Trade Association v. International*

*Longshoremen's Association,* 453 Pa. 43, 308 A.2d 98 (1973); *Wortex Mills v. Textile Workers Union of America,* 380 Pa. 3, 109 A.2d 815 (1954); *Fife v. Great Atlantic and Pacific Tea Company,* 356 Pa. 265, 52 A.2d 24 (1947). Compare *Schnabel Associates v. Bldg. and Construction Trades,* 338 Pa.Super. 376, 487 A.2d 1327 (1985) (Pennsylvania Labor Anti-Injunction Act does not apply to civil contempt sanctions by reason of "violent exceptions." 43 Pa.C.S.A. § 206d(d)).

Although the cases which apply the labor act's more stringent standards of proof are indeed claims for damages for economic harm while the present action is for personal injury, we see no reason for distinction between the two. Given the intent to shield a union and its members from liability for acts not participated in nor authorized or ratified by them, we see no valid reason for distinguishing between economic and personal loss by reason of "individual" acts of union members. For this reason we disagree with the holding of the Washington Supreme Court in *Buchanan v. Int'l. Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, et al.,* 94 Wash.2d 508, 617 P.2d 1004.[2]

**2.** The *Buchanan* economic harm—physical harm distinction has been criticized. We agree with the following statement found in Note, *Labor Unions Vicarious Liability for Torts Committed by Members,* 57 Washington Law Review 193, 205–06 (1981).

This conclusion also rebuts the argument in Justice Rosellini's concurrence that the Washington court was not bound by either *United Brotherhood* or *Gibbs* because those cases involved economic harms while *Buchanan* involved physical harm.[68] This is solely a factual distinction, one that has been given no further support in any cases or statutes addressing a union's vicarious liability. Justice Rosellini assumed, without citing any authority, that the United States Supreme Court would decide a future tort case involving physical harm differently than it decided *Gibbs,* a tort case involving an economic harm.[69] In fact, an indication to the contrary exists in *United Brotherhood* where the Court stated that "[t]he limitations of [section 6] are upon all courts of the United States *in all matters growing out of labor disputes,* covered by the Act, which may come before them."[70] This willingness of the United States Supreme Court to broadly apply the union-liability standard is entirely consistent with the congressional decision to include among labor

■ Appellees next argue that if the § 206h standard applies generally to the present matter, it is in fact not applicable because of the provision of § 206d(d) which provides that the Act shall not apply in any case:

(d) Where in the course of a labor dispute as herein defined, an employe, or employes acting in concert, or a labor organization, or the members, officers, agents, or representatives of a labor organization or anyone acting for such organization, seize, hold, damage, or destroy the plant, equipment, machinery, or other property of the employer with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining. 1937, June 2, P.L. 1198, § 4; 1939, June 9, P.L. 302, § 1.

Here, it is argued that since there was damage to property in the course of the labor dispute, the present matter is exempted from the Act's strictures. We note that the only ascertained property damage was a broken window. We do not believe that the above provision, which was a 1939 amendment to the Pennsylvania Anti-Injunction Act, should be so broadly read, particularly to render inapplicable the liability restrictions grounded on strong public policy, in a case involving only incidental and insubstantial damage to property. A reading of the original 1937 Act and its 1939 amendment demonstrates that the Act was amended to restore to the courts the power to grant *injunctive relief* in certain labor dispute situations where there is seizure, damage, or destruction of property of the employer. The amendment properly reaffirmed the court's power to protect property rights from otherwise unrestrained appropriation or destruction. Pennsylvania cases are consonant with respect to this interpretation of the 1939 amendment. *Schnabel Associates v. Building and Construction Trades, supra,* was a case in which the lower court, after the issuance of injunctive relief, found the union in contempt. On appeal, this court noted that the Anti-Injunction Act did not apply because of the extensive property damage

disputes *"any controversy* concerning terms or conditions of employment."[71] (Footnotes omitted)

and violent activity, and relief was granted pursuant to the court's power to *restrain* violence, mass picketing and overt threats of violence in order to protect public order and safety and prevent damage. *See also Carnegie-Illinois Steel Corp. v. United Steel Workers of America,* 353 Pa. 420, 45 A.2d 857 (1946); *Westinghouse Electric Corp. v. United Electrical Radio & Machine Workers of America,* 353 Pa. 446, 46 A.2d 16 (1946); *DeWilde v. Scranton Building Trades and Construction Council,* 343 Pa. 224, 22 A.2d 897 (1941).

We conclude that the purpose of the 1939 amendment was simply to restore equity jurisdiction to the courts to restrain unlawful conduct in a labor dispute and does not apply to the present personal injury tort action.

■ Further support for the conclusion that the § 206d(d) "damage" provision does not extend to the inconsequential window damage in this case is found in a recent panel case of this court. In *Frankel-Warwick, Ltd. v. Local 274,* 334 Pa.Super. 47, 482 A.2d 1073 (1984), where the court found that where picketing activities made travel on sidewalks and egress to the petitioner's hotel "difficult" it was not sufficient to amount to a seizure.[3] Similarly, the trivial damage incurred herein is not sufficient to invoke the violence exception. More recently, in *Solvent Machinery and Filters Systems, Inc. v. Teamsters Local Union 115,* 343 Pa.Super. 505, 495 A.2d 579 (1985) a panel majority of this court reversed the issuance of an injunction, where there was some property damage and picketing which resulted, at the least, in interference with the conduct of business. Our court observed that there was no evidence which linked the property damage to an intention of compelling the employer to perform specific acts as required by § 206d(d).

Finally, our court has recently spoken on the issue of the availability of a cause of action in negligence against labor unions in a matter arising out of a labor dispute. In *LaZar v. RUR Industries, Inc. v. United Steel Workers of Amer-*

---

**3.** To the extent that appellant argues that there was some slight interference with car access to 3M's plant, Frankel-Warwick is dispositive of any claim that this amounted to a "seizure."

*ica,* 337 Pa.Super. 445, 487 A.2d 29 (1985) (Spaeth, P.J., concurring in result) a picketing union member was injured in a melee while on picket duty. He sued the employer in tort for damages for negligence in failing to control off-duty employees. The employer sought to join the union as an additional defendant on the basis that its negligence caused the injury. Our court agreed with the trial court's dismissal of the complaint against the union. Citing provisions of the Labor Anti-Injunction Act, the court concluded that "[b]efore a plaintiff may recover from a union in a strike-related complaint, he must be able to show, by the weight of the evidence, that the acts complained of were ordered, authorized or ratified by the union." 337 Pa.Superior Ct. 445 at 449–50, 487 A.2d 29 at 31.

The trial court, in the present case, concluded that the restrictive standards of § 206h did not apply and permitted the jury to find the appellees liable on common law agency principles under the duty to control the picket line theory. Nevertheless, at trial the court undertook to charge the jury in accordance with the standards set forth in § 206h and in answer to special interrogatories the jury found against the union defendants since the union "actually participated in, actually authorized or ratified after actual knowledge thereof, the unlawful acts which caused the injuries."[4] The trial court thus submitted the case to the jury on two theories: (1) § 206h; and, (2) common law agency principles as they relate to the duty to maintain a picket line. The theories were submitted in four separate interrogatories and the jury found against both unions on both theories. The second theory will be discussed *infra.* The charge of the court on the § 206h standard with the exception of the recitation of the jury interrogatories, was contained in a single paragraph and simply stated that there must be proof that the "acts charged were actually authorized, actually participated in by, or ratified after actual knowledge thereof by [the unions]". There were no instructions as to the meaning of these concepts as they might

---

**4.** The "ratification" theory was charged to the jury despite the fact that the court had earlier excluded it as a permissible basis for recovery.

apply to the facts of this case. Nevertheless, we conclude that there is not sufficient evidence in the record of actual participation, actual authorization, or ratification to warrant submission of this issue to the jury and conclude that the trial court erred in doing so. In *Phila. M.T. Ass'n. v. ILA, supra,* our supreme court rejected the argument that a union could be held responsible for the acts of its members despite the fact that the lower court found the efforts to prevent the violation by various officers was "half hearted and not taken in good faith and inept" and in violation of the order to "take all reasonable steps which may be necessary [to carry out the order]". The supreme court concluded:

> However, we believe that much more is required to hold a union or its officers responsible under § 206h of the Pennsylvania Labor Anti-Injunction Act.

308 A.2d 98 at 103.

The court proceeded to cite the following from the United States Supreme Court opinion in *Brotherhood of Carpenters v. United States,* 330 U.S. 395, 403, 67 S.Ct. 775, 780, 91 L.Ed. 973, 982–93 (1947):

> "... whether § 6 should be called a rule of evidence or one that changes the substantive law of agency ... its purpose and effect was to relieve organizations ... and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."

It must be remembered that the unions are unincorporated associations, with large numbers of trustees, officers, employees and members, and that the purpose of § 206h is to protect the union and its membership from liability for unlawful and unauthorized acts of persons associated with the union. The tortious shooting in this case was an act of irrational behavior by a lone intoxicated

member of the union, perpetrated without reason on the person of two fellow union members and a fellow employee. There is not a suggestion in the record that the unions and their membership authorized, participated in or ratified this act of wanton misconduct. Imposing liability on the union for the unauthorized lawlessness of its more improvident members would penalize the union lawfully engaged in using legitimate economic means to resolve labor-management conflicts. *Scott v. Moore*, 640 F.2d 708 (5th Cir.1981). The fact that the record may contain evidence of acts of violence and unlawful conduct by persons who were officers and members of the union is insufficient without more to fix responsibility on the union. *Fife v. Great A & P Tea Co.*, 356 Pa. 265, 52 A.2d 24 (1947), *cert. denied*, 332 U.S. 778, 68 S.Ct. 42, 92 L.Ed.2d 362 (1947), *reh'g. denied*, 332 U.S. 821, 68 S.Ct. 143, 92 L.Ed. 397 (1947).[5]

We conclude that the restrictive standards of 206h apply to this matter, and that there was insufficient evidence of the actual participation, actual authorization, or ratification of the acts upon which appellees' claim is based to support a finding of union liability.

### THE DUTY TO MAINTAIN AND CONTROL A PICKET LINE AND COMMON LAW AGENCY

■ In addition to submitting the case to the jury on the basis of 206h liability, the trial court, by way of separate

---

5. In the following part of this opinion we find that the evidence does not support a finding of common law agency, a less stringent standard for fixing vicarious liability than that required by § 206h. That discussion, therefore, applies to our present disposition. In addition, a reading of the applicable cases makes it clear that the evidence here falls far short of the "clear proof" of actual authorization, participation or ratification necessary to render the union liable. *United Steelworkers v. Lorain*, 616 F.2d 919 (6th Cir.1980) *cert. denied* 451 U.S. 983, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981); *Kayser-Roth Corp. v. Textile Workers of America, supra; Curreri v. International Brotherhood of Teamsters, supra; Kerry Coal v. United Mine Workers, supra; C and K Coal Co. v. United Mine Workers, supra; James R. Snyder Co., Inc. v. Edward Rose and Sons, Inc.*, 546 F.2d 206 (6th Cir.1976); *Dow Chemical Co. v. International Union of Electrical Radio and Machine Workers*, 480 F.2d 433 (5th Cir.1973); *cert denied* 415 U.S. 932, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974).

interrogatories, submitted the matter under a charge of duty to maintain a picket line and common law agency principles. The jury, in its verdict, also found the unions responsible under this theory. Since we have concluded that the restrictive standard of 206h applies and that the evidence of vicarious responsibility was insufficient as a matter of law, it follows that the court erred in submitting the case to the jury on the basis of common law agency principles since 206h permits recovery only under the restrictive conditions set forth in that provision. As a matter of judicial economy, however, we will discuss the matter under Pennsylvania's common law agency principles as we conclude that even if they were to apply, the evidence was insufficient as a matter of law and that judgment N.O.V. should be entered on this basis.

■ In order to assess the legal propriety of the appellees' theory of union responsibility, it is again necessary to focus on the parties' respective contentions and the trial itself. Initially, it is important to observe that throughout the course of this litigation, including the trial, the charge to the jury and the appellate briefs, the terminology "principal and agent" is used almost exclusively. It is instructive, at the outset, to recognize that not every relationship of principal and agent creates vicarious responsibility in the principal for acts of the agent. The distinction was discussed by our supreme court in *Smalich v. Westfall*, 440 Pa. 409, 269 A.2d 476 (1970).

■ Agency is the relationship which results from (1) the manifestation of consent of one person to another that (2) the other shall act on his behalf and subject to his control, and (3) consent by the other so to act: *Chalupiak v. Stahlman*, 368 Pa. 83, 81 A.2d 577 (1951); Restatement (Second), Agency § 1(1) (1958). Such agency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary: *Rosenberg v. Cohen*, 370 Pa. 507, 88 A.2d 707 (1952); Restatement (Second), Agency § 1, comments a and b (1958). "The right of control by the principal may be exercised by

prescribing what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times * * *. Further, the principal has power to revoke the agent's authority, although this would constitute a breach of his contract with him * * *. The control of the principal does not, however, include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective:" Restatement (Second), Agency § 14, comment a. Since an agent who is not a servant is not subject to any right of control by his principal over the details of his physical conduct, the responsibility rests upon the agent alone, and the principal is *not* liable, for harm caused by his unauthorized negligent physical conduct: *Commonwealth v. Minds Coal Mining Corp.*, 360 Pa. 7, 60 A.2d 14 (1948); Restatement (Second), Agency § 250 (1958). Thus it has long been said to be the general rule that there is no vicarious liability upon the principal in such case: Prosser, The Law of Torts § 70 (3d ed. 1964). ▮▮▮ "A master is a species of principal, and a servant is a species of agent:" Restatement (Second), Agency § 2, comment a. "A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the *physical conduct* of the other in the performance of the service. A servant is an agent employed by a master to perform service in his affairs whose *physical conduct* in the performance of the service is controlled or is subject to the right to control by the master:" Restatement (Second), Agency § 2(1) and (2) (Emphasis added.). Thus a master not only controls the results of the work but also may direct the manner in which such work shall be done, and a servant, in rendering the agreed services, remains entirely under the control and direction of the master: *Joseph v. United Workers Assn.*, 343 Pa. 636, 23 A.2d 470 (1942); *McColligan v. Penna. R.R. Co.*, supra. "Those rendering service but retaining control over the manner of doing it are not servants. They may be agents, agreeing only to use care and skill to accomplish

a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal * * *:" *Commonwealth v. Minds Coal Mining Corp.,* supra, 60 A.2d at 17. Because a master has the right to exercise control over the physical activities of the servant within the time of service, he *is* vicariously liable for the servant's negligent acts committed within the scope of his employment: Restatement (Second), Agency § 219 (1958); Prosser, The Law of Torts § 69 (3d ed. 1964).

440 Pa. at 413–15, 269 A.2d at 481.

*See also Juarbe v. City of Philadelphia,* 288 Pa.Super. 330, 431 A.2d 1073 (1981); *Turley v. Kotter,* 263 Pa.Super. 523, 398 A.2d 699 (1979).

 Similarly, although the charge of the court makes no mention of the concept of apparent authority, the briefs and opinion of the court *en banc* refer to the evidence as forming a basis for a finding of union responsibility on the basis of, *inter alia,* the apparent authority of Crossan and Kendig to act on behalf of Local 107. Appellees, for example, argue that Crossan was an agent of Local 107 and possessed actual, implied and apparent authority with regard to the picket line and rely upon the lower court's citation of *Reifsnyder v. Dougherty,* 301 Pa. 328, 152 A. 98 (1930) and *Revere Press, Inc. v. Blumberg,* 431 Pa. 370, 246 A.2d 407 (1968) for the principle that one who leads persons with whom his agent deals to believe that the agent has power to bind his principal may be liable on the theory of apparent authority. Thus, it is argued that Crossan had at least apparent authority over the conduct of the picket line and liability of the union ensues. While the doctrine of apparent authority is undoubtedly recognized in Pennsylvania, we fail to see its applicability to the present case. Apparent authority is grounded on the theory that the principal creates circumstances which cause one dealing with the agent to reasonably believe that the agent has the authority and relies on this belief. *Reifsnyder, supra,* and *Revere Press, supra,* cite the principle in settings dealing with contract liability because of reliance on the agent's

authority. *See Juarbe v. City of Philadelphia,* 288 Pa.Super. at 343, 431 A.2d at 1079–80. ("The two doctrines [apparent authority and agency by estoppel] are customarily relevant in the context of business transactions...."). Here, the claim is one in tort for the negligence which resulted in the shooting. We fail to see how the appellees can be said in any way to have *relied* upon the apparent authority of Crossan (or anyone else) to avoid being the victims of the shooting incident.

Finally, it is not clear from the record as to precisely what agent or servant of the union is claimed to have been negligent and in what manner. In the court's charge in chief, there is no mention by name of any "agent" of the union, although there is a reference to the fact that plaintiff contended that "certain union stewards and members of the negotiating committee were in fact agents of Local 107...." Nevertheless, the court went on to charge the jury to determine "the nature of the relationship which existed between certain witnesses and [the unions]." The general nature of the charge was further demonstrated when the court stated:

> Consider under all the evidence of this case whether any agency relationships existed. Consider which witnesses were officers or employees of either Local 107 or the IBT. Consider what occurred during the course of the strike, and most importantly on January 25th, 1980.

That the jury may have been confused by the dual agency charge (i.e., 206h agency and common law agency) which were cast in only the most general terms is demonstrated by the fact that after twenty-five minutes of deliberation they returned with a question asking for a definition of agency. Again, less than two hours later the jury returned with another question relating to the agency charge. The jury, at this time, was refused their request for a dictionary. Thirty-five minutes later the jury asked for written instructions as to agency. At this time, the court again charged on agency making specific reference to Mr. Cimino, the president of Local 107, Mr. Smalley, the business agent,

and Crossan and Kendig, but again left the issue of agency to the jury.

> I will leave it to you to decide who, if any people would fall into that category, and Between Local 107 and IBT, a principal, that is in this case Local 107 with respect to his agent, if you find it has agents or the IBT with respect to its agents, if you find it has any agents. That's the question for you.

Thereafter, the jury resumed deliberation and returned the verdict.

We have discussed these matters, not in the context of error in the court's charge, for indeed it does not appear that there were any exceptions to the court's charge, but rather to determine the nature of the cause of action asserted by appellees and submitted to the jury by the court for, while there were no exceptions to the charge, appellants have consistently argued that the evidence was insufficient to permit a recovery against the unions.

■ Thus, our present standard is to assess the asserted cause of action as formulated and fashioned by the court in its charge; to examine its cognizability under principles of Pennsylvania law; and determine the sufficiency of evidence. We do so under the following standard:

> The standard of review for an order denying a motion for a judgment N.O.V. is well defined. It is the same standard used by the trial judge in deciding whether to grant the motion. 'Accepting as true all facts and proper inferences which tend to support the contention of the party against whom the motion has been made, and rejecting all testimony and inferences to the contrary,' we must reverse such an order denying the motion 'when no two reasonable minds could differ that, as a matter of law, the party has failed to make out his case.' *Timbrook v. Foremost Ins. Co.*, 324 Pa.Super. 384, 387, 471 A.2d 891, 892–93 (1984). It is not within this court's province to weigh the evidence or to render judgments as to credibility. *See City of Bethlehem v. Gawlik*, 30 Pa.

Commonwealth Ct. 390, 374 A.2d 540, 542 (1977); P.L.E. Judgment § 146.

*Ingrassia Construction Co. v. Walsh,* 337 Pa.Super. 58, 486 A.2d 478, 480 (1984).

The duty which is alleged to have been breached is the duty to monitor and control a picket line. We are furnished no cases directly dealing with this concept of union responsibility. Furthermore, the court provided no instruction as to the nature of a union's accountability with respect to setting up and managing a picket line, the degree of control, monitoring or surveillance which reasonably must be maintained over the picket line, and the standards applicable thereto; or the conditions under which the union may reasonably be required to take action to avoid the accidents or injury as a result of misconduct on the picket line. The jury was simply told to determine *if* the unions had a duty to monitor and control the picket line and thereafter to decide whether they were negligent in carrying out that duty.

■ Assuming, *arguendo,* that a duty to maintain a picket line is a cognizable duty of a union under Pennsylvania law, we believe it is error for the court to leave to the jury to decide if such a duty exists (and also, presumably, the nature and extent of the duty). The existence of a duty and its extent is not for the jury to determine. *Cf. O'Toole v. Borough of Braddock,* 397 Pa. 562, 155 A.2d 848 (1959) (court erroneously charged jury to determine issue of law); *Berry v. Friday,* 324 Pa.Super. 499, 472 A.2d 191 (1984) (a trial judge is charged with the responsibility of determining all pertinent questions of law). Stated otherwise, we conclude that it was error for the court to submit to the jury a cause of action for failure to monitor and control a picket line wherein the existence of the duty to maintain a picket line is left for jury determination.

■ We further find that, under the facts of this case, there was no breach of duty by the unions which could form the basis for recovery of damages from the unions. Initial-

ly, when we view the conduct of union member Ballinger, we think it is clear beyond peradventure that his act in shooting his fellow employees, including two fellow strikers, was beyond any reasonable scope of his authority.

The law is clear that a servant who uses excessive force or acts in an outrageous manner steps outside the scope of his authority and in such circumstances, the master is not vicariously liable for the servant's act. *Lunn v. Yellow Cab Co.*, 403 Pa. 231, 169 A.2d 103 (1961) (cab driver stabbed prospective passenger in altercation); *Potter Title and Trust Co. v. Knox*, 381 Pa. 202, 113 A.2d 549 (1955) (cab driver shot at striking workers); *Howard v. Zaney Bar*, 369 Pa. 155, 85 A.2d 401 (1952) (owner of bar not liable when bartender shot patron who had made a pass at female customer); *Fitzgerald v. McCutcheon*, 270 Pa.Super. 102, 410 A.2d 1270 (1979) (off duty policeman shot neighbor while attempting "arrest"); *Straiton v. Rosinsky*, 183 Pa. Super. 545, 133 A.2d 257 (1957) (movie usher struck patron with flashlight—under facts, scope of employment for jury, but issue may be one of law).

Appellant's theory of union responsibility seeks to avoid the consequences of this principle which would be a barrier to union responsibility by focusing on the duty to maintain the picket line. In this regard, although it was not apparent from the charge, a reading of the briefs [6] and the record, discloses that the thrust of appellees' argument centered on the role which William Crossan played during the strike action and, specifically, at the time of the incident forming the basis of this suit. The appellees contend that Crossan represented the local in a supervisory capacity with respect to the picketing. The union, while admitting that Crossan had acted as chief steward for the union at the 3M plant, argued that his duties in this capacity expired with the union contract, and that he had no official supervisory role with respect to the conduct of the picket line. We have already disagreed with the court's discussion of apparent

---

6. The opening and closing addresses to the jury and counsel's arguments on legal points are not part of the record.

authority as having no applicability to the present claim of tort liability. Nevertheless, insofar as the role of Crossan acting on behalf of the union in a managerial capacity with respect to the picketing activities, the record supports a conclusion that he was vested with at least some authority to act in a supervisory capacity with respect to the operation of the picket line.[7] Merely concluding that Crossan had some authority over the picket line, however, does not fix responsibility on the union for, inevitably, contrary to appellees' argument, one must determine the scope of the authority, and whether the shooting was so contrary to the likely incidents of picketing activities as to be unforeseeable and beyond the scope of reasonable control of picketing. Accordingly, one must determine not only the fact of agency, but also the dimensions thereof. *Cf. Mellon Nat'l. Bank v. Esler*, 357 Pa. 525, 55 A.2d 327 (1947); *Lewis v. Matias*, 300 Pa. 238, 150 A. 636 (1930); *Beal & Simons v. Adams Express Co.*, 13 Pa.Super. 143 (1900).

Essentially, the duty which appellees seek to vest in Crossan, (absolute responsibility to police the picket line) is not one supported by the evidence. The present case is unlike cases where the owner of a bar may be responsible for the maintenance and policing of employees and patrons on the premises. *See Ash v. 627 Bar, Inc.*, 197 Pa.Super. 39, 176 A.2d 137 (1961); *Poulos v. Brady*, 167 Pa.Super. 150, 74 A.2d 694 (1950) or, where the agent is employed in a capacity where the tortious act is directly related to the performance of the agent's duties. *See Orr v. William J. Burns International Detective Agency*, 337 Pa. 587, 12 A.2d 25 (1940) (shooting by guard hired to protect persons and property); *Sebastianelli v. Cleland Simpson*, 152 Pa. Super. 203, 31 A.2d 570 (1943) (attack on suspected shoplifters by detective in the employment of store). But even in

7. Evidence of Crossan's supervisory role as shown by actual or implied authority, included the fact that he helped write up the picketing assignments when the strike was initiated; he came to the picket line to make sure who was there for pay purposes; he received reports from the picketers and passed them on to the business agent; and distributed strike funds and leaflets which bore his name as a member of the negotiating committee.

these situations, not every act is attributable to the principal. *Mac Phail v. Pinkerton's National Detective Agency,* 134 Pa.Super. 351, 3 A.2d 968 (auto repossessor held to be outside scope of employment in personal assault); *Dalsey v. Czeiner,* 154 Pa.Super. 194, 35 A.2d 523 (1944) (bartender-in-charge struck patron off premises after closing). *See also Teal v. Kings Farms Co.,* 285 F.2d 62 (3d Cir.1960) (employer not liable for assault on fellow employee unless master knew or should have known of the necessity and opportunity for exercising control); Restatement of Torts 2nd § 317.

Assuming, then, that Crossan had some duty to maintain or control the picket line, this fact does not make him or the union the insurer of the conduct of the picketers, nor does it make the acts of Crossan the act of the union for he is at best acting only as an agent or servant of the union. Simply removing the responsibility one step from the acting tortfeasor (Ballinger) does not avoid the issue: was not the shooting, either viewed from the standpoint of Ballinger as actor or Crossan as agent with some supervisory responsibility, so far outside the scope of the agent's authority as to render the master (union) not responsible. Our supreme court here opined:

> An act may be within the scope of the employment although consciously criminal or tortious. On the other hand, the fact that the servant intends to commit a crime, especially if the crime is of some magnitude, is to be considered in determining whether or not the act is within the employment, since the master is not responsible for acts which are clearly inappropriate to or unforeseeable to the accomplishment of the authorized result. As in other cases, *it is a matter of degree, the question being whether or not the conduct is so unlike that authorized that it is substantially a different thing.* Sum.Pa.Jur. Agency, Section 238.

*First National Bank of Altoona v. Turchetta,* 407 Pa. 511, 181 A.2d 285, 287–88 (1962) (emphasis in original).

Appellees' theory is that Local 107 was negligent in that this shooting was a natural and foreseeable consequence of

its negligent maintenance of the picket line and that the union created an atmosphere ripe for violence and injury. As support for the theory that the union anticipated violence on the picket line, appellees cite the fact that the union business agent gave a speech to the membership at the time the strike vote was taken in which he stated there was to be no violence or "carrying on" on the picket line. This laudable caution is cited by appellees as evidence that violence was anticipated. The argument is disingenuous. Picketing is, of course, perfectly legal. It is, by its nature, confrontational and carries risks that untoward incidents may occur. To suggest that exhortations against violence may be used as the basis of respondeat superior responsibility for a subsequent shooting defies experience and logic. Other instances of misconduct cited by appellees are equally unpersuasive as evidence that the shooting or Crossan's alleged laxity were foreseeable. For example, appellees cite Smalley's awareness of isolated instances such as nails placed in the 3M parking lot, a single occasion when a rock was thrown through a 3M window, and some evidence that, despite admonitions to the contrary, there was some drinking during the picketing activities. It is more than a quantum leap to conclude that from such isolated instances during a ten week strike, the unions could be held to foresee that a member would become intoxicated, have possession of a deadly weapon and fire upon and strike three persons without reason; or, given appellees' theory as to the duty to control the picket line, that an employee with some supervisory capacity would not intervene to prevent the shooting incident.

Similarly, appellees extract several remarks from the labor-management rhetoric which accompanied the strike action to support their claim of union responsibility. Thus, on one occasion, the local president, Cimino, stated to the 3M negotiator following a lack of progress "... it is going to get hot now" and on another occasion Smalley stated "it's calm now but wait." Given the hyperbole and posturing that inevitably accompany labor-management negotia-

tions one would have to engage in tortured reasoning to conclude that these isolated remarks evidence awareness of a risk that there would be such a bizarre dereliction by a drunken member, which, even giving credence to the most distorted reasoning, could in any circumstances be interpreted to further the union's cause in any way.

We assume, without deciding, that Pennsylvania would recognize a duty in a union to control a picket line authorized by it. We conclude, however, that there was insufficient evidence to warrant jury determination that the shooting incident, or the failure to monitor or control the picket line, were, on application of agency principles, attributable to the union. We reach this conclusion as to both Local 107 and IBT, and we do so regardless of whether Ballinger, Crossan, Kendig, Smalley, Cimino or any other individual be viewed as the agent of the unincorporated associations (unions) for the purposes of vicarious liability.

Since we have concluded that judgment N.O.V. should be entered in favor of both appellant unions, we do not reach the other issues raised by appellants on appeal.

Judgment N.O.V. entered in favor of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and Highway Truck Drivers and Helpers Local Union No. 107.